# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| John Doe, | ) | Case No. 3:07CV604 |
| | ) | |
| | ) | DEFENDANTS EXPERIENCED |
| Plaintiff, | ) | INTERNET.COM, INC.'S, |
| | ) | MAURICIO BEDOYA'S AND |
| | ) | PATRICIA QUESADA'S MOTION |
| v. | ) | TO DISMISS THE COMPLAINT FOR |
| | ) | LACK OF PERSONAL |
| | ) | JURISDICTION (FRCP 12(b)(2)) |
| SexSearch.com, et al., | ) | AND FOR FAILURE TO STATE A |
| | ) | CLAIM UPON WHICH RELIEF MAY |
| | ) | BE GRANTED (FRCP 12(b)(6)); |
| Defendants. | ) | DECLARATION OF DANA |
| | ) | MILMEISTER AND REQUEST FOR |
| | ) | JUDICIAL NOTICE IN SUPPORT |
| | ) | THEREOF |
| | ) | |
| | ) | Richard M. Kerger (0015864) |
| | ) | KERGER & ASSOCIATES |
| | ) | 33 S. Michigan Street, Suite 100 |
| | ) | Toledo, Ohio 43604 |
| | ) | Telephone: (419) 255-5990 |
| | ) | Fax: (419) 255-5997 |
| | ) | |
| | ) | Gary Jay Kaufman (*Pro hac vice*) |
| | ) | Dana Milmeister (*Pro hac vice*) |
| | ) | The Kaufman Law Group |
| | ) | 1925 Century Park East |
| | ) | Suite 2350 |
| | ) | Los Angeles, California 90067 |
| | ) | Telephone: (310) 286-2202 |
| | ) | Fax: (310) 712-0023 |
| | ) | |
| | ) | Counsel for Specially Appearing |
| | ) | Defendants Experienced Internet.com, |
| | ) | Inc., Mauricio Bedoya and Patricia |
| | ) | Quesada |

## **TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................................................1

II.   THE COURT LACKS PERSONAL JURISDICTION OVER THE DEFENDANTS .......3

III.  AGE VERIFICATION ON THE INTERNET IS CONSTITUTIONALLY
      UNREASONABLE AND PLAINTIFF COULD NOT REASONABLY RELY
      ON THE PERCEIVED PROMISE TO DO SO ...................................................6

IV.   THE COMMUNICATIONS DECENCY ACT PRE-EMPTS PLAINTIFF'S
      TORT CLAIMS ...........................................................................................7

V.    AS A MATTER OF LAW, PLAINTIFF'S CLAIMS FAIL AND AMENDMENT
      WOULD BE FUTILE...................................................................................10

      A.    The Contract Is Clear, Unambiguous And Enforceable ........................................10

      B.    The TAC Are Not Unconscionable In Any Way...................................................12

      C.    The Fraud and Negligent Misrepresentation Claims Fail Because Plaintiff
            Did Not Have A Special Relationship With Defendants And Plaintiff's
            Reliance Was Not Reasonable ..............................................................16

      D.    Plaintiff's Breach Of Warranty Claim Fails Because There Was No
            Warranty And Because He Could Not Have Reasonably Relied On
            The Purported Warranty.......................................................................17

      E.    The Ohio Consumer Protection Statutes Do Not Apply To This Case.................18

      F.    As A Matter Of Law, Defendants Cannot Be Held Liable For
            Negligent Infliction Of Emotional Distress ..........................................20

      G.    Plaintiff's Failure To Warn Claim Is Meritless ....................................21

VI.   CONCLUSION...........................................................................................21

## TABLE OF AUTHORITIES

**Cases**

*ACLU v. Gonzales,* _____ F. Supp.2d _____, 2007 WL 861120  (E.D. Pa. 2007) ............. 1, 20, 22

*Aschcroft v. ACLU,* 542 U.S. 656, 667, 668 (2004) ........................................................6

*Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos.,* 67 Ohio St.3d 274 (1993) ......15

*Calphalon Corp. v. Rowlette,* 228 F.3d 718 (6th Cir. 2000)..........................................3

*Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119 (9th Cir.2003)..................................9

*Cole v. Mileti,* 133 F.3d 433 (6th Cir. 1998)................................................................4

*Collins v. Click Camera & Video, Inc*, 86 Ohio App.3d 826 (1993)..................................... 13-15

*Conti v. Pneumatic Prods. Corp.,* 977 F.2d 978 (6th Cir. 1992)......................................4

*Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d 414 (9th Cir. 1997).......................................4

*Dickerson Internationale, Inc. v. Klockner*, 139 Ohio App. 3d 371 (2000) ................................16

*Dimeo v. Max,* 433 F.Supp.2d 523, 528 (E.D.Pa.2006)...................................................9

*Doe v. Bates,* 2006 WL 3813758 (E.D. Tex. Dec.27, 2006) ...........................................10

*Doe v. MySpace, Inc.* ___ F.Supp. 2nd ___, 2007 WL 471156 (W.D. Tex 2007) ............... 2, 8-10

*Dorsey v. Contemporary Obstetrics & Gynecology, Inc.* 113 Ohio App.3d 75 (1996)................13

*Feitchner v. City of Cleveland,* 95 Ohio App.3d 388 (1994)..........................................21

*Feldman v. Google, Inc,* 2007 WL 966011 (E.D.Pa. Mar. 29, 2007)...........................................13

*Finomore v. Epstein*, 18 Ohio App. 3d 88 (1984) ......................................................17

*Foust v. Valleybrook Realty Co*., 4 Ohio App. 3d 164 (1981)......................................17

*Freas v. Prater Constr.  Corp., Inc*, 60 Ohio St.3d 6 (1991)...................................... 21

*Goldstein v. Christiansen,* 70 Ohio St.3d 232 (1994)...................................................3

*Green v. America Online,* 318 F.3d 465 (3d Cir.2003) .................................................9

*Hoang v. Etrade,* 151 Ohio App.3d 363, 372 (2003) ................................................................20

*Hubbert v. Dell Corp.*, 359 Ill.App.3d 976 (2005) ..................................................................15

*Hurst v. Enterprise Title Agency,* 157 Ohio App.3d 133 (2004) .............................................13, 14

*Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945) ................................................................3

*Leal v. Holtvogt*, 123 Ohio App. 3d 51(1998) ........................................................................16

*LeRoux's Billyle Supper Club v. Ma,* 77 Ohio App.3d 417, 422-423 (1991) ..............................5

*Livengood v. ABS Contractors Supply*, 126 Ohio App.3d 464 (1998) .......................................21

*Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899 (2d Cir. 1981) ...........................................5

*Martin v. Ohio State Univ. Found.*, 139 Ohio App. 3d 89 (2000) ..............................................16

*Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog,*
    954 F.2d 1174 (6th Cir. 1992) ..........................................................................................3

*Music Express Broadcasting Corp. v. Aloha Sports, Inc.,* 161 Ohio App.3d 737 (2005) ..........  4-5

*Novak v. Overture Services, Inc.* 309 F.Supp.2d 446 (E.D.N.Y. 2004) ..................................15-16

*Orbit Electronics, Inc. v. Helm Instrument Co., Inc.,* 167 Ohio App.3d 301 (2006) ...................17

*Paugh v. Hanks*, 6 Ohio St. 3d 72 (1983) ............................................................................21

*Picker Intern., Inc. v. Mayo Foundation*, 6 F. Supp. 2d 685 (N.D. Ohio 1998)............................17

*Price Bros. Co. v. Philadephia Gear Corp.,* 649 F.2d 416 (6th Cir. 1981) .................................. 18

*Southern Machine Company v. Mohasco Industries, Inc.,*
    401 F.2d 374 (6th Cir. 1968) ........................................................................................... 4

*Specht v. Netscape Comms. Corp.,* 306 F.3d 17 (2d Cir.2002) .................................................13

*Taylor Steel, Inc. v. Keeton,* 417 F.3d 598 (6th Cir.2005)..........................................................5

*Texas v. Johnson,* 491 U.S. 397 (1989) ...............................................................................22

*Third Natl. Bank in Nashville v. WEDGE Group, Inc.,* 882 F.2d 1087 (6th Cir. 1989).................4

*Weiner v. Klais & Co.,* 108 F.3d 86, 89 (6th Cir. 1997)...........................................................11

*Welsh v. Gibbs,* 631 F.2d 436 (6th Cir.1980) ........................................................................4

*Zeran v. America Online, Inc.,* 129 F.3d 327 (4th Cir.1997).........................................................9

## United States Constitution

First Amendment ..........................................................................................................7, 22

## Statutes And Rules

### Federal

47 U.S.C. § 230..........................................................................................................7, 9
47 U.S.C. § 231..............................................................................................................6
Fed. R. Civ. Proc. 12 .......................................................................................................1

### Ohio

R.C. § 1302.26.............................................................................................................18
R.C. § 1345.01.......................................................................................................19, 20
R.C. § 1345.02.............................................................................................................18
R.C. § 1345.03.............................................................................................................19
R.C. § 1345.12.............................................................................................................20
R.C. § 2307.382...........................................................................................................3
Ohio Adm.Code 109:4-3-01 ...........................................................................................19

Specially appearing defendants Experienced Internet.com, Inc. ("EIC"), Mauricio Bedoya and Patricia Quesada hereby move to dismiss the complaint for lack of personal jurisdiction and, alternatively, for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure, respectively.

## I.

## INTRODUCTION

The Court does not have personal jurisdiction over moving defendants and, moreover, the entire complaint is meritless and should be dismissed without leave to amend because Congress and the U.S. Constitution have provided immunity to all the claims.

Plaintiff admitted under oath that he had sex with a 14-year-old child and now wants to blame sexsearch.com, the dating site where they allegedly met, for failing to discover that she lied about her age to join the site. In all likelihood, Plaintiff just figured he would not be caught committing this despicable crime, but, now having been indicted, he is trying to deflect blame to others. The case is as absurd as it sounds; it is common knowledge that a website has limited capability to verify age. Even the U.S. Supreme Court has acknowledged that a reliable method has not been developed that does not overly restrict free speech. No reasonable person should or would rely on technology to do what Ohio law requires he do for himself – verify age before having sex. The complaint should not even get past the starting gate.

As a threshold issue, this Court lacks jurisdiction over the named defendants, none of whom operate the sexsearch.com or sexsearchcom.com websites. Plaintiff tries to convince this Court that the named defendants are alter-egos of some mysterious offshore company that is hoarding money and evading jurisdiction. Nothing could be further from the truth. Plaintiff's counsel did not even name the one entity identified as the site operator in sworn declarations filed in the Northern District of California. Cytek is a well-capitalized and solvent going concern. None of the other defendants have any contacts with Ohio, and none has control over

1

operation of the sexsearch.com and sexsearchcom.com websites.  None come even close to meeting the alter ego tests, and the Court therefore should dismiss them.[1]

Plaintiff's entire case is based on a statement that is part of a WARNING to minors to stay out of the site:

**WARNING: This Site Contains Adult Material**

Explicit pictures, videos, stories, images, or sounds will be contained on this website. If you are under 18 years of age, or if it is illegal to view adult material in your community, you must exit this page now. All models are at least 18 years old, all persons within this site are 18+ and all images are in compliance with 18 U.S.C. 2257

Plaintiff claims that the phrase "all persons within this site are 18+" constitutes a warranty that no minors will be allowed to join.  This interpretation is unbelievable. The entire WARNING section is addressed to minors; not adults.  Moreover, Plaintiff's complaint alleges that he agreed to the terms and conditions ("TAC"), which clearly disclaim all warranties and, further, all responsibility for verifying the accuracy of the information provided by other users of the service.  In order to join, Plaintiff only had to check a box verifying that he was over 18.  He knew that is all Jane Roe had to do, and his claimed reliance on the site to protect him from having sex with a minor is misplaced and unreasonable.

Defendants are immune from liability in this case.  In enacting the Communications Decency Act ("CDA"), Congress expressly immunized internet service providers such as the sexsearch.com site from liability for all information posted or provided by site members.  Case law interpreting the CDA holds that sites such as MySpace.com and AOL.com are not liable for damages members suffer as a result of meeting through the site.  Defendants are therefore immune from liability for operation of the SexSearch.com site.

---

[1] Unfortunately, to establish the Court's lack of jurisdiction, Defendants are necessarily required to reveal their confidential and proprietary business information.  Defendants have done so, but hope that before this Court requires revelation of any additional information, the Court reaches the merits of Cytek's motion to dismiss, which may obviate the need for any additional jurisdictional discovery.

Plaintiff's claims that the TAC violate the Ohio Consumer Practices Act (the "Act") and are unconscionable are likewise misplaced. The CDA pre-empts the Act, which therefore does not apply. Moreover, the transaction at issue is not a "consumer transaction" as defined by the Act, and the Act itself exempts publishers from enforcement against them. Likewise, the TAC are not unconscionable. Courts that have examined similar "clickwrap" agreements have concluded that these types of agreements are not unconscionable as a matter of law because of the nature of the internet business and the fact that Plaintiff could have chosen not to join if he did not like the terms.

This is not a close case; even assuming all of Plaintiff's allegations as true, the complaint fails to state a claim and should be dismissed with prejudice and without leave to amend.

## II.

## THE COURT LACKS PERSONAL JURISDICTION OVER THE DEFENDANTS

The Court lacks personal jurisdiction over EIC, Mr. Bedoya and Ms. Quesada. No federal statute governs jurisdiction in this case, and thus personal jurisdiction exists if defendant is amenable to service of process under Ohio's long-arm statute and "if the exercise of personal jurisdiction would not deny the defendant[ ] due process." *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog,* 954 F.2d 1174, 1176 (6th Cir. 1992). Ohio's long-arm statute is not coterminous with federal constitutional limits. R.C. § 2307.382; *Calphalon Corp. v. Rowlette,* 228 F.3d 718, 721 (6th Cir. 2000) (noting that "the Ohio Supreme Court has ruled that the Ohio long-arm statute does not extend to the constitutional limits of the Due Process Clause"), *citing Goldstein v. Christiansen,* 70 Ohio St.3d 232, 638 N.E.2d 541, 545 n. 1 (1994) (per curiam).

Accordingly, in evaluating whether personal jurisdiction is proper under Ohio's long-arm statute, the Sixth Circuit focuses on whether there is due process: whether "there are sufficient minimum contacts between the nonresident defendant and the forum state so as not to offend 'traditional notions of fair play and substantial justice.'" *Id.*, *quoting, Int'l Shoe Co. v.*

*Washington,* 326 U.S. 310, 316 (1945));  *Cole v. Mileti,* 133 F.3d 433, 436 (6th Cir. 1998)

(addressing the due process concerns rather than inquiring into the propriety of jurisdiction under

Ohio's long-arm statute).

Personal jurisdiction can be either general or specific, depending upon the nature of the

contacts that the defendant has with the forum state.  *Conti v. Pneumatic Prods. Corp.,* 977 F.2d

978, 981 (6th Cir. 1992) (noting that a distinction between general and specific jurisdiction exists

for the purpose of the due process analysis).  General jurisdiction is proper only where "a

defendant's contacts with the forum state are of such a continuous and systematic nature that the

state may exercise personal jurisdiction over the defendant even if the action is unrelated to the

defendant's contacts with the state."  *Third Natl. Bank in Nashville v. WEDGE Group, Inc.,* 882

F.2d 1087, 1089 (6th Cir. 1989) (internal quotation marks omitted).

Specific jurisdiction is permissible only if defendants' contacts with Ohio satisfy a three-

part test:

> (1) the defendant must purposefully avail himself of the privilege of acting in the
> forum state or causing a consequence in the forum state; (2) the cause of action
> must arise from the defendant's activities there; and (3) the defendant's acts, or
> consequences thereof must have a substantial enough connection with the forum
> state to make the exercise of jurisdiction over the defendant reasonable."

*Southern Machine Company v. Mohasco Industries, Inc.,* 401 F.2d 374, 381 (6th Cir. 1968).  The

maintenance of a passive website the contains advertisements does not even justify the exercise

of specific jurisdiction.  *Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d 414, 419-20 (9th Cir. 1997).

Plaintiff named many of the defendants based on the theory that they are alter egos of

each other, and therefore should be held liable for SexSearch's operation.  In a diversity action,

the Court applies the Ohio alter ego doctrine.  *See, e.g., Welsh v. Gibbs,* 631 F.2d 436, 439 (6th

Cir. 1980).  Although Ohio law has a formal test for veil-piercing, "the legal conception [of alter

ego liability] has historical antecedents in both federal and state law. Such cases may provide

sound analogies or insightful analyses relating to the formal test set forth in [Ohio law] without

usurping its authority." *Music Express Broadcasting Corp. v. Aloha Sports, Inc.,* 161 Ohio

App.3d 737, 742 (2005). The Court, therefore, in addition to Ohio law, relies on Sixth Circuit case law applying the alter ego theory of personal jurisdiction insofar as such cases are consistent with Ohio law pertaining to the alter ego doctrine.

Ohio's corporate veil-piercing test consists of three prongs, the first of which is Ohio's alter ego doctrine used for purposes of jurisdictional determinations. *Taylor Steel, Inc. v. Keeton,* 417 F.3d 598, 605 (6th Cir. 2005), *citing Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos.,* 67 Ohio St.3d 274, 287 (1993); *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir. 1981) (noting that for jurisdictional purposes, unlike for liability purposes, use of control to commit a fraud or wrong is not required). That test is met "when . . . control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own." *Belvedere*, 67 Ohio St. 3d at 287.

In deciding whether the company is an alter ego of the individual, Ohio courts consider such factors as: "(1) grossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporation was a mere facade for the operations of the dominant shareholder(s)." *LeRoux's Billyle Supper Club v. Ma,* 77 Ohio App.3d 417, 422-423 (1991) (court held defendant sole shareholder was not alter ego of defendant corporation). The declarations filed concurrently herewith under seal establish that the Court does not have jurisdiction over EIC, Mr. Bedoya or Ms. Quesada. Cytek operates the sexsearch.com and sexsearchcom.com websites. None is an alter ego of Cytek.

Likewise, as to the other named defendants, the declarations establish that none of the named individual defendants operate the SexSearch.com or SexSearchcom.com websites in their individual capacities, and none of the named entity defendants do either. All are financially independent companies and Cytek is a well-capitalized, solvent going concern that pays its bills when due. Corporate formalities are timely observed and taxes timely filed and the companies

are in compliance with all applicable tax and registration laws and each is independent.  None of the defendants is an alter ego of the other, and only Cytek is responsible for operating the SexSearch.com and SexSearchcom.com sites.[2]

### III.

### AGE VERIFICATION ON THE INTERNET IS CONSTITUTIONALLY UNREASONABLE AND PLAINTIFF COULD NOT REASONABLY RELY ON THE PERCEIVED PROMISE TO DO SO

Federal courts have already found that it is impossible for web site operators to easily confirm age and therefore they cannot be required to do so.  Last month, after trial on the merits and extensive expert testimony, the Philadelphia District Court enjoined the enforcement of the Child Online Protection Act ("COPA"), 47 U.S.C. § 231.  *ACLU v. Gonzales,* ____ F. Supp.2d _____, 2007 WL 861120  (E.D. Pa. 2007).  COPA provides both criminal and civil penalties for transmitting sexually explicit materials and communications to minors over the web.  The *Gonzales* court found that the statute is neither narrowly tailored to the compelling interest of protecting minors, nor the least restrictive and most effective alternative to meet that interest.  The court found "no evidence of age verification services or products available on the market to owners of Web sites that actually reliably establish or verify the age of Internet users.  Nor is there evidence of such services or products that can effectively prevent access to Web pages by a minor."  *Id.* at 25.  The court held that parents could use filters to protect their children, and that the law requiring web publishers to do so violates the First and Fifth Amendments.

The *Gonzales* case was decided after remand from the U.S. Supreme Court on appeal of the preliminary injunction entered in that case.  *Ashcroft,* 542 U.S. 656.  The Court affirmed the preliminary injunction, and also agreed that filters are likely the least restrictive alternative to COPA:

---

[2] The websites that are named as defendants should be dismissed because they are corporate assets and not persons capable of being sued.  *See, e.g.,* Declarations of Karen Bender and Richard Stewart, filed concurrently herewith under seal.

> Filters are less restrictive than COPA. They impose selective restrictions on speech at the receiving end, not universal restrictions at the source.  Under a filtering regime, adults without children may gain access to speech they have a right to see without having to identify themselves or provide their credit card information.  Even adults with children may obtain access to the same speech on the same terms simply by turning off the filter on their home computers.  Above all, promoting the use of filters does not condemn as criminal any category of speech, and so the potential chilling effect is eliminated, or at least much
>
> diminished. All of these things are true, moreover, regardless of how broadly or narrowly the definitions in COPA are construed.
>
> Filters also may well be more effective than COPA. First, a filter can prevent minors from seeing all pornography, not just pornography posted to the Web from America.  The District Court noted in its factfindings that one witness estimated that 40% of harmful-to-minors content comes from overseas.  [] COPA does not prevent minors from having access to those foreign harmful materials.  That alone makes it possible that filtering software might be more effective in serving Congress' goals.

*Id.* at 666.

As a matter of law, Plaintiff did not reasonably rely on any perceived warranty to keep minors out.  Reasonableness/justifiable reliance is an element of Plaintiff's claims for breach of warranty, fraud, negligent misrepresentation, and failure to warn.  *See,* §§ V-C-F, below.  Additionally, assuming *arguendo* that the contract terms at issue are ambiguous, the Court should interpret those terms to ensure the parties' constitutional rights are protected (in this case, SexSearch's members' First Amendment rights).  An interpretation of the TAC that allows Plaintiff to maintain his claims violates the First and Fifth Amendments, because it would effectively require SexSearch.com to do what the U.S. Supreme Court said Congress could not require it to do: warrant that minors will not be on the site.  The complaint should be dismissed.

## IV.

## THE COMMUNICATIONS DECENCY ACT PRE-EMPTS PLAINTIFF'S TORT CLAIMS

Plaintiff's claims are preempted by the Communications Decency Act, 47 U.S.C. § 230 ("CDA").  The CDA mandates that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information

content provider."  It further provides that, "[n]o cause of action may be brought and no liability

may be imposed under any State or local law that is inconsistent with this section."

"The term 'interactive computer service' means any information service, system, or

access software provider that provides or enables computer access by multiple users to a

computer server, including specifically a service or system that provides access to the Internet

and such systems operated or services offered by libraries or educational institutions."  47 U.S.C.

§ 230(f)(2).  "The term 'information content provider' means any person or entity that is

responsible, in whole or in part, for the creation or development of information provided through

the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3).

The statute and case law make clear that SexSearch.com is an interactive computer service and

Plaintiff and Jane Roe are information content providers.  Six weeks ago, the District Court in

Austin Texas held that MySpace.com is an "interactive computer service" and therefore could

not be held liable for allowing a minor to become a member, which led to her sexual assault by

another member, both of whom the court found to be "information content providers."  *Doe .v.

MySpace, Inc*. ___ F.Supp. 2nd ___, 2007 WL 471156 (W.D. Tex 2007).

In enacting the CDA, Congress made the following findings:

> (1) The rapidly developing array of Internet and other interactive computer
> services available to individual Americans represent an extraordinary advance in
> the availability of educational and informational resources to our citizens. (2)
> These services offer users a great degree of control over the information that they
> receive, as well as the potential for even greater control in the future as
> technology develops. (3) The Internet and other interactive computer services
> offer a forum for a true diversity of political discourse, unique opportunities for
> cultural development, and myriad avenues for intellectual activity. (4) The
> Internet and other interactive computer services have flourished, to the benefit of
> all Americans, with a minimum of government regulation. (5) Increasingly
> Americans are relying on interactive media for a variety of political, educational,
> cultural, and entertainment services.

47 U.S.C. §  230(a).  CDA's underlying policy is promotion of "the continued development of

the Internet and other interactive computer services...." 47 U.S.C. §  230(b)(1).  "The provision

'precludes courts from entertaining claims that would place a computer service provider in a

publisher's role,' and therefore bars 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions-such as deciding whether to publish, withdraw, postpone, or alter content." *Dimeo v. Max,* 433 F.Supp.2d 523, 528 (E.D.Pa. 2006), *quoting  Green v. America Online,* 318 F.3d 465, 471 (3d Cir. 2003); *Zeran v. America Online, Inc.,* 129 F.3d 327, 330 (4th Cir. 1997)). "The CDA thus encourages web sites and other "interactive computer services" to create forums for people to exchange their thoughts and ideas by protecting web sites and interactive computer services from potential liability for each message republished by their services." *MySpace,* at  3, *citing, Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119, 1122-24 (9th Cir. 2003) (Matchmaker.com immune from effects of false personal ad listing resulting in harassment of the plaintiff); *Zeran,* 129 F.3d at 330-31.

The purpose of this statutory immunity is clear:

> Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium.   The imposition of tort liability on service providers for the communications of others represented, for Congress, simply another form of intrusive government regulation of speech. Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum.

* * *

> By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.  [In enacting the CDA] Congress made a policy choice ... not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages.

*Zeran,* 129 F.3d at 330-31.

In *MySpace,* plaintiffs argued that the CDA did not apply because they did not sue "MySpace for the publication of third-party content but rather for failing to implement basic safety measures to prevent sexual predators from communicating with minors on MySpace." *Id.* at 4.  The District Court rejected that argument, and found that the statute was not limited to defamation claims, but also applied to claims for other torts, such as negligence. *MySpace* at 4,

*citing, Doe v. Bates,* 2006 WL 3813758 (E.D.Tex. Dec. 27, 2006) (court found that Yahoo! Inc. immune from liability for postings of sexually explicit photos of the minor plaintiff).

Also, like Plaintiff in this case, the *MySpace* plaintiffs asserted that "the CDA does not bar their claims against MySpace because their claims are not directed toward MySpace in its capacity as a publisher. Plaintiffs argue this suit is based on MySpace's negligent failure to take reasonable safety measures to keep young children off of its site and not based on MySpace's editorial acts." The court also rejected this argument and found that:

> It is quite obvious the underlying basis of Plaintiffs' claims is that, through postings on MySpace, Pete Solis and Julie Doe met and exchanged personal information which eventually led to an in-person meeting and the sexual assault of Julie Doe. If MySpace had not published communications between Julie Doe and Solis, including personal contact information, Plaintiffs assert they never would have met and the sexual assault never would have occurred. No matter how artfully Plaintiffs seek to plead their claims, the Court views Plaintiffs' claims as directed toward MySpace in its publishing, editorial, and/or screening capacities. Therefore, in accordance with the cases cited above, Defendants are entitled to immunity under the CDA, and the Court dismisses Plaintiffs' negligence and gross negligence claims with prejudice.

*Id.* at 5. This analysis applies in this case. Plaintiff and Jane Roe would not have met but for the information published on the site. Therefore, the CDA immunizes defendants from any liability and the complaint should be dismissed.

## V.

## AS A MATTER OF LAW, PLAINTIFF'S CLAIMS FAIL AND AMENDMENT WOULD BE FUTILE

### A.    <u>The Contract Is Clear, Unambiguous And Enforceable</u>.

Plaintiff's first cause of action is for breach of contract. Plaintiff alleges he agreed to the TAC. (Comp. ¶ 292). A pre-requisite to joining SexSearch is a click in a box warranting that the customer is over 18 and has read agreed to the TAC and privacy policy:

YOU MUST CHECK THE BOX BELOW TO PROCEED.

I am over 18, I have read and agreed to the
terms and conditions and the privacy policy .

The TAC are clear and unambiguous that there is no warranty as to members' ages. (Ex. A). [3]

Specifically, the TAC provides (emphasis in original):

2. **Eligibility** You must be eighteen or over to register as a member of SexSearch
or use the Website. Membership in SexSearch is intended for adult use only and is
void where prohibited. By using the Website, you represent and warrant that you
have the right, authority, and capacity to enter into this Agreement and to abide by
all of the terms and conditions of this Agreement. SexSearch reserves the right to
terminate your account if we learn that you have provided SexSearch or its
personals partner sites with false or misleading registration information.

9. **. . .** You agree to not use SexSearch to: . . . b. harm or involve minors (those
under age 18) in any way ; . . . k. intentionally or unintentionally violate any
applicable local, state, national or international law and any regulations having the
force of law;

11. **Indemnity** You agree to indemnify and hold SexSearch and its subsidiaries,
affiliates, officers, agents, co-branders or other partners, and employees, harmless
from any claim or demand, including reasonable attorneys' fees, made by any
third party due to or arising out of Content you submit, post, transmit or make
available through SexSearch, your use of SexSearch, your connection to
SexSearch, your violation of the TAC, or your violation of any rights of another.

12. **Limitation on Liability** Except in jurisdictions where such provisions are
restricted, in no event will SexSearch be liable to you or any third person for any
indirect, consequential, exemplary, incidental, special or punitive damages,
including also lost profits arising from your use of the Web site or the Service,
even if SexSearch has been advised of the possibility of such damages.
Notwithstanding anything to the contrary contained herein, SexSearch's liability
to you for any cause whatsoever, and regardless of the form of the action, will at

---

[3] Although not included in the complaint, the Court may consider the TAC, Privacy Policy, the
WARNING and the age-check box without converting this motion to a summary judgment
motion. Plaintiff has alleged that he agreed to the terms on the site and he has quoted portions of
the WARNING. In this circuit "[d]ocuments that a defendant attaches to a motion to dismiss are
considered part of the pleadings if they are referred to in the plaintiff's complaint and are central
to [his] claim." *Weiner v. Klais & Co.,* 108 F.3d 86, 89 (6th Cir. 1997).

all times be limited to the amount paid, if any, by you to SexSearch for the
Service during the term of membership.

15. **YOU EXPRESSLY UNDERSTAND AND AGREE THAT: a.** Your use of
SexSearch is at your sole risk. SexSearch is provided on an "as is" and "as
available" basis. SexSearch expressly disclaims all warranties of any kind,
whether express or implied, including, but not limited to the implied warranties of
merchantability, fitness for a particular purpose and non-infringement. b.
SexSearch Makes no warranty that: . . . III. the results that may be obtained from
the use of SexSearch will be accurate or reliable; IV. the quality of any . . .
information, or other material . . . obtained by you through SexSearch will meet
your expectations . . .. d. No advice or information, whether oral or written,
obtained by you from SexSearch or through or from SexSearch shall create any
warranty not expressly stated in the TAC.

17. We cannot guarantee, and assume no responsibility for verifying, the
accuracy of the information provided by other users of the Service.

The privacy policy provides:

This is an adult Site that expressly and strictly limits its membership to adults. All
persons under the age of majority in their jurisdiction are strictly prohibited from
accessing or viewing the contents of this Site. [¶]  This Site does not knowingly
seek or collect any personal information or data from persons under the age of
majority.

* * *

Each paying or non-paying member should carefully read each of the terms and
conditions of Membership of this Site. By accepting membership to this Site you
are unconditionally accepting all of those terms and conditions.

The terms are clear.  All warranties are disclaimed.  Liability is limited to the amount Plaintiff

spent on his membership.  Additionally, as the TAC is only between members and Cytek (the

website operator), then the claim is also meritless as to the other defendants who are not parties

to the contract and therefore are not bound by its terms.  Plaintiff's breach of contract claim is

meritless.

B.    **The TAC Are Not Unconscionable In Any Way.**

As a matter of law, the TAC are not unconscionable.  Four of Plaintiff's claims are based

on claimed unconscionability of the TAC ($10^{th} - 13^{th}$ causes of action).  Specifically, he claims

that (a) the TAC are unconscionably one-sided; (b) the TAC provide no guarantee that

12

Defendants would or could perform their contractual promises; (c) he was not provided with a meaningful choice regarding the terms limiting and disclaiming liability.  Plaintiff is wrong.  As a matter of law, the TAC are not unconscionable.

Ohio's unconscionability doctrine consists of two 1 prongs: "(1) substantive unconscionability, i.e., unfair and unreasonable contract terms, and (2) procedural unconscionability, i.e., individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible." *Dorsey v. Contemporary Obstetrics & Gynecology, Inc.* 113 Ohio App.3d 75, 80 (1996).  A contract is unconscionable only if it meets both tests. *Collins v. Click Camera & Video, Inc*, 86 Ohio App.3d 826, 834 (1993).

Substantive unconscionability involves factors relating to the contract terms themselves and whether they are commercially reasonable. *Dorsey*, 113 Ohio App.3d at 80.  "Procedural unconscionability involves those factors bearing on the relative bargaining position of the contracting parties, *e.g.,* "age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, whether there were alternative sources of supply for the goods in question." *Collins,* 86 Ohio App.3d at 834. "Unconscionability is a question of law." *Hurst v. Enterprise Title Agency,* 157 Ohio App.3d 133, 809 N.E.2d 689, 694 (2004).

The TAC "is commonly referred to as a 'clickwrap' agreement. A clickwrap agreement appears on an internet webpage and requires that a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction." *Feldman v. Google, Inc,* 2007 WL 966011, p. 6 (E.D.Pa. Mar. 29, 2007), *citing, Specht v. Netscape Comms. Corp.,* 306 F.3d 17, 22 (2d Cir. 2002).  "Even though they are electronic, clickwrap agreements are considered to be writings because they are printable and storable." *Feldman,* at 6 (granting summary judgment to Google on Plaintiff's claim that, *inter alia,* limitation of liability in clickwrap agreement was unconscionable).

13

The TAC are neither procedurally nor substantively unconscionable.  Plaintiff's first unconscionability claim is that the TAC are one-sided fails as a matter of law.  Plaintiff seems to be complaining mainly about the site's unilateral right to cancel.  This is not unconscionable; it is designed to protect members.  The site must be monitored for members who are violating the TAC and privacy policy.  Also, a unilateral right to cancel is not contrary to any Ohio law.  A three-day grace period is only required for home purchase contracts (R.C. § 1345.23); credit services contracts with credit services organizations (R.C. § 4712.05); and goods and services sold by telephone solicitors (R.C. § 4719.07).  Moreover, the TAC makes clear that if the site cancels the membership, the member will receive a pro-rata refund.  (Ex. A, ¶ 3).  This is entirely reasonable and not unconscionable.

Separately, limitations of liability and damages are not unconscionable and do not violate public policy.  "The inclusion of an exculpatory clause in a contract, generally, does not violate public policy." *Hurst,* 809 N.E.2d at 694.  "In considering whether a provision in a contract is against public policy, [] we must remember that the freedom to contract is fundamental, and that we should not lightly disregard a binding agreement, unless it clearly contravenes some established or otherwise reasonable public interest." *Id.* (citation omitted).

The *Hurst* court examined an exculpatory clause in an escrow agreement and held it was not unconscionable because escrow services are not necessary for a person's living needs; they are not quasi-public in nature and the escrow company did not have a monopoly.  Moreover, the limitation was reasonable in light of the escrow company's small fee ($200) for a $355,000 real estate transaction.  *Hurst,* 809 N.E.2d at 695.  The *Collins* court also held that a clause in a video transfer contract limiting damages to the cost of the film was not unconscionable.  That court held:

> The charge for such services is minimal compared to the potential liability for negligence. (Here, the total charge for transferring twenty-eight reels of film onto video tape was $234.28, or $8.37 per reel, and Collins's complaint sought in excess of $25,000 in damages.) In addition to this disparity in price and claimed damages, it is also significant that, given the nature of film processing, the extent

> of potential liability is unpredictable because the processor is generally unaware
> of the content of the film when delivered and unable to replace that content should
> the film be lost or destroyed. In order to limit exposure to such unpredictable
> liability, limitation of liability clauses have become a standard in the film
> processing industry. Without such clauses, film processors would have to increase
> the cost of their services to cover this exposure. This consideration has often been
> held to be a commercially reasonable one.

*Collins,* 86 Ohio App.3d at 834-835.  Likewise, a SexSearch membership is not a "necessary good or service."  The terms are clear and written in plain English.  Plaintiff could have gone to other adult dating sites for sex.  A quick Google search yields 14 other similar sites.[4]  (Ex. B).  And, like the escrow and film cases, the membership charge is negligible compared to the potential liability.  (Plaintiff's counsel told EIC's counsel that Plaintiff is seeking millions of dollars and will agree to keep the defendants' business information private if he gets the settlement he seeks).  It is also significant that, given the nature of the adult dating website, the site cannot control its members actions when they meet, and the limitation of liability is necessary to limit exposure.  Without such clauses, adult dating sites would have to increase the cost of membership to cover this exposure.  The clause is commercially reasonable.

Courts routinely hold that clickwrap agreements are enforceable and not unconscionable. *See, e.g., Hubbert v. Dell Corp.*, 359 Ill.App.3d 976 (2005) and *Novak v. Overture Services, Inc*. 309 F.Supp.2d 446 (E.D.N.Y. 2004).  The *Hubbert* court held that terms were sufficiently conspicuous so as not to be procedurally unconscionable.  The court noted that the site had hyperlinks for terms in contrasting blue colors; clause in question was partially in capital letters; and the beginning of the terms were in "bold, capital letters."  *Hubbert*, 359 Ill.App.3d at  987. The same is true of the TAC.  The terms are highlighted in bold, capital letters and with hyperlinks to highlighted some of the more important terms.  (Ex. A).  The TAC simply are not unconscionable.

The *Novak* court held that a forum selection clause in the terms and conditions agreement for website operator's discussion group was not unconscionable. 309 F.Supp.2d at 451-452. Like

---

[4] Defendants request that the Court take judicial notice of the fact that there are numerous other adult dating websites.  (*See,* Req. for Jud. Not).

the Plaintiff here, the *Novak* plaintiff argued "that since there was no option to negotiate the terms of the contract, it must be unenforceable"  The *Novak* court rejected the argument. "Plaintiff had a full and fair opportunity to refuse the terms of this contract.  There is also no indication that Plaintiff was under any external pressure to accept these terms. An agreement cannot be considered procedurally unconscionable, or a contract of adhesion, simply because it is a form contract." *Id.*

The same analysis applies here: Plaintiff was not forced to buy a SexSearch membership. He had a full and fair opportunity to refuse the terms and join another adult dating site.  Plaintiff chose to agree to the terms, and, as a matter of law, they are not unconscionable.

**C.     The Fraud and Negligent Misrepresentation Claims Fail Because Plaintiff Did Not Have A Special Relationship With Defendants And Plaintiff's Reliance Was Not Reasonable.**

As a matter of law, Plaintiff cannot establish the elements of a special relationship with any of the defendants, which is a necessary element of the negligent misrepresentation claim; and he cannot establish reasonableness, which is an element of both misrepresentation claims. A negligent misrepresentation claim is stated when one who, in the course of his or her business, profession, or employment, supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused to those others by their justifiable reliance upon the information, if the person providing the information fails to exercise reasonable care or competence in obtaining or communicating the information.  *See, e.g.*, *Dickerson Internationale, Inc. v. Klockner*, 139 Ohio App. 3d 371 (2000); *Martin v. Ohio State Univ. Found.*, 139 Ohio App. 3d 89 (2000); *Leal v. Holtvogt*, 123 Ohio App. 3d 51(1998).

> The elements of a claim for fraud are (a) a representation . . . (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Orbit Electronics, Inc. v. Helm Instrument Co., Inc.***,** 167 Ohio App.3d 301, 313-314 (2006).

As a matter of law, Plaintiff did not act reasonably in relying on the purported representation. Plaintiff knew that all members only had to state that they were 18 by checking a box; and the TAC and privacy policies gave additional warnings that the site did not guarantee members' ages. No reasonable person who uses the internet could justifiably rely in any express warranties, let alone warnings directed to keep minors out of the site. The misrepresentation-based claims are meritless.

Additionally, under Ohio law, a core requirement of a negligent misrepresentation claim is a special relationship pursuant to which the defendant supplied information to the plaintiff for the latter's guidance in its business transactions. This relationship occurs only in special circumstances; the requisite "special" relationship for a negligent misrepresentation claim does not exist in ordinary business transactions. Usually the defendant is a professional (e.g., an accountant) who is in the business of rendering opinions to others for their use in guiding their business, and the plaintiff is a member of a limited class. *Picker Intern., Inc. v. Mayo Foundation*, 6 F. Supp. 2d 685 (N.D. Ohio 1998). In the absence of a fiduciary relationship, the law requires a person to exercise proper diligence in his or her dealings, such that when a person is put on notice as to any doubt as to the truth of a representation, that person is under a duty to reasonably investigate before relying on the representation. *Finomore v. Epstein*, 18 Ohio App. 3d 88 (1984); *Foust v. Valleybrook Realty Co.*, 4 Ohio App. 3d 164 (1981). The website operator did not have a special relationship with Plaintiff, and the claim fails for this additional reason as well.

Plaintiff's fraud and negligent misrepresentation fail as a matter of law.

**D.      Plaintiff's Breach Of Warranty Claim Fails Because There Was No Warranty And Because He Could Not Have Reasonably Relied On The Purported Warranty.**

Plaintiff's claim for breach of warranty fails for two separate and independent reasons. First, Ohio law only provides for express warranties of goods, and not services. Second, and separately, reasonableness is an element of a claim for breach of warranty, and, as established

repeatedly throughout this brief, Plaintiff was not reasonable in his purported reliance on the claimed warranty.

The only apparent basis for a breach of warranty claim is R.C. § 1302.26, which reads in pertinent part as follows:

> (A) Express warranties by the seller are created as follows:
> (1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

This section specifically states that it applies to "buyers" and "sellers." Buyer means "a person who buys or contracts to buy goods." R.C. § 1302.01(A)(1). Seller means "a person who sells or contracts to sell goods." R.C. § 1302.01(A)(4). And Goods means "all things which are movable at the time of identification." R.C. § 1302.01(A)(8). It is clear that these definitions do not apply to this case and the claim therefore fails.

Assuming, *arguendo,* a claim can be stated for breach of warranty of services, the statement "All persons within this site are 18+" is a warning to minors to stay out, and not a warranty that they will be kept out. Additionally, the Court should consider whether the buyer was reasonable in believing the seller. *Price Bros. Co. v. Philadephia Gear Corp.,* 649 F.2d 416, 422 (6th Cir. 1981). In this case, for reasons discussed above, even if Plaintiff can state a claim for breach of warranty regarding services, Plaintiff's reliance on the perceived warranty was not reasonable (if, in fact, he really even noticed the warning or read it). The claim fails as a matter of law.

**E.     The Ohio Consumer Protection Statutes Do Not Apply To This Case.**

Plaintiff claims that various aspects of the TAC are deceptive (6th-9[th] causes of action). Specifically, Plaintiff alleges violations of the following statutes:

> (A) "Consumer transaction" means a sale . . . of . . . a service . . . or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things.

(C) "Supplier" means a seller . . . or other person engaged in the business of effecting or soliciting consumer transactions.

R.C. § 1345.01.

(A) No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

(B) Without limiting the scope of division (A) of this section, the act or practice of a supplier in representing any of the following is deceptive:

(10) That a consumer transaction involves or does not involve a warranty, a disclaimer of warranties or other rights, remedies, or obligations if the representation is false.

R.C. § 1345.02.

(A) No supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

(B) In determining whether an act or practice is unconscionable, the following circumstances shall be taken into consideration:

(5) Whether the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier.

R.C. § 1345.03.

Plaintiff's practices act claims are pre-empted by the CDA because they attempt to impose liability for information published by information content providers.

Separately and additionally, the transaction at issue is not covered by the act. Sale of a SexSearch membership is not a "consumer transaction." The membership does not qualify as a "service," which is defined as: "performance of labor for the benefit of another." Ohio Adm.Code 109:4-3-01(C). "Although the term 'labor' is not defined, the common ordinary meaning of the word 'labor' implies work performed with some physical exertion. Services provided electronically do not require any physical exertion and therefore do not require any

19

'labor.'"  *Hoang v. Etrade,* 151 Ohio App.3d 363, 372 (2003) (court found that Etrade transactions not subject to the Act).

Even assuming the statute applies to sale of SexSearch memberships, the claims still fail. The consumer protection act does not apply to "[a] publisher . . . or other person engaged in the dissemination of information or the reproduction of printed or pictorial matter insofar as the information or matter has been disseminated or reproduced on behalf of others without knowledge that it violated sections 1345.01 to 1345.13 of the Revised Code."  R.C. § 1345.12(B).  While no cases have interpreted this statute as it applies to publishers, it is clear that SexSearch is a publisher.  Congress expressly refers to sites that publish third-parties' information as "publishers."  47 U.S.C. § 230(c)(1).  Likewise, the *ACLU v. Gonzales* opinion refers to sites at issue as "web publishers." --- F.Supp.2d ---- at 37, ¶ 22.  As a matter of law, SexSearch.com is a publisher, and therefore exempt from the Ohio Consumer Protection Act.

Separately and additionally, even if the act applies, the claims fail on their merits. The claim that the unilateral right to cancel a membership is deceptive is unsupportable.  That term is reasonable, in light of SexSearch's desire to ensure that its members don't harass each other, post advertisements or otherwise violate the TAC.  No law requires that members be given a three-day cancellation period, which is unreasonable in light of the fact that they can cancel at any time and are liable only for one-month membership fee.

There is no support for Plaintiff's claim that the limitation of damages is deceptive; it is a reasonable and common contract term.  (*See,* § V-B, above).

The Ohio consumer protection statutes clearly do no apply to this case for several separate and independent reasons.  The claims are meritless and should be dismissed.

## F.     As A Matter Of Law, Defendants Cannot Be Held Liable For Negligent Infliction Of Emotional Distress

The CDA pre-empts Plaintiff's claim for negligent infliction of emotional distress, and, additionally, he cannot establish the essential element of causation.  The elements are: 1) the Defendant's actions; 2) created an unreasonable risk of harm (or that serious emotional distress

20

was a reasonably foreseeable consequence); 3) the Plaintiff suffered severe and debilitating emotional distress, and 4) the harm was actually and proximately caused by the Defendant's act. *See, Paugh v. Hanks*, 6 Ohio St. 3d 72 (1983).

The CDA immunizes SexSearch from any liability for all torts, including infliction of emotional distress. (*See,* § III, above). Separately, SexSearch's actions did not create the risk of harm; the Plaintiff's and Jane Roe's actions did. Moreover, the Plaintiff's and Jane Roe's own criminal acts are a superseding and intervening causes of his damages, and Plaintiff therefore cannot establish proximate causation.[5] *Feitchner v. City of Cleveland,* 95 Ohio App.3d 388, 396 (1994). The claim is meritless.

### G.    Plaintiff's Failure To Warn Claim Is Meritless.

Plaintiff was warned many times about the risk of minors on the site; he chose to ignore those warnings in the TAC. The site cannot be liable for that choice. Failure to warn claim consists of the following elements: (1) that there was a duty to warn, (2) that duty was breached, and (3) that the injury proximately resulted from that breach. *Freas v. Prater Constr. Corp., Inc*, 60 Ohio St.3d 6, 8-9. (1991). Where the danger is open and obvious, there is no duty to warn. *Livengood v. ABS Contractors Supply*, 126 Ohio App.3d 464 (1998).

In this case, not only was the danger open and obvious, Plaintiff was in fact warned. The TAC specifically warns about minors and lack of warranty. Additionally, as with the other claims, Plaintiff's own crime is a superseding intervening cause of his damages and thus he cannot prove the causation element of this claim.

### VI.

### CONCLUSION

The complaint fails for several separate and independent reasons, set forth above. Nobody denies the importance of protecting minors; indeed, it is crucial. However, that compelling interest cannot be placed above our freedoms of speech and association. The

---

[5] Plaintiff's acts in sexually assaulting a minor; Roe's acts in lying about her age.

*Gonzales* court eloquently summarized the Court's role in addressing the emotionally-charged

issue:

> I agree with Congress that its goal of protecting children from sexually explicit materials on the Web deemed harmful to them is especially crucial. This court, along with a broad spectrum of the population across the country yearn for a solution which would protect children from such material with 100 percent effectiveness. However, I am acutely aware of my charge under the law to uphold the principles found in our nation's Constitution and their enforcement throughout the years by the Supreme Court. I may not turn a blind eye to the law in order to attempt to satisfy my urge to protect this nation's youth by upholding a flawed statute, especially when a more effective and less restrictive alternative is readily available (although I do recognize that filters are neither a panacea nor necessarily found to be the ultimate solution to the problem at hand). My feelings resonate with the words of Justice Kennedy, who faced a similar dilemma when the Supreme Court struck down a statute that criminalized the burning of the American flag:

> 'The hard fact is that sometimes we must make decisions we do not like. We make them because they are right, right in the sense that the law and the Constitution, as we see them, compel the result. And so great is our commitment to the process that, except in the rare case, we do not pause to express distaste for the result, perhaps for fear of undermining a valued principle that dictates the decision. This is one of those rare cases.' *Texas v. Johnson,* 491 U.S. 397, 420-421 (1989) (Kennedy, J. concurring).

> Despite my personal regret at having to set aside yet another attempt to protect our children from harmful material, I restate today, as I stated when granting the preliminary injunction in this case, that 'I without hesitation acknowledge the duty imposed on the Court [as Justice Kennedy observed] and the greater good such duty serves. Indeed, perhaps we do the minors of this country harm if First Amendment protections, which they will with age inherit fully, are chipped away in the name of their protection.'

*Gonzales,* _____ F.Supp. 2nd _____ at pp. 44-45.

Our constitutional rights to freedom of association and speech are on the chopping block

in this case. Plaintiff should not be allowed to chip away at those rights in the name of

protecting child molesters.  Aside from the Court's clear lack of jurisdiction, the complaint is meritless and should be dismissed with prejudice forthwith.

Respectfully submitted,

/s/ Richard M. Kerger
RICHARD M. KERGER (0015864)
Counsel for Specially Appearing Defendant
Experienced Internet.com, Inc.


/s/ Gary Jay Kaufman
Gary Jay Kaufman (*pro hac vice*)
Counsel for Specially Appearing Defendant
Experienced Internet.com, Inc.

## <u>DECLARATION OF DANA MILMEISTER</u>

I, Dana Milmeister, declare and state as follows:

      1.      I am Of Counsel to The Kaufman Law Group, and, along with Gary Jay Kaufman, represent Experienced Internet.com, Inc. ("EIC"). The facts set out below are known to me personally, and if called on I could testify to those facts, under oath.

      2.      Attached hereto as Exhibit A are true and correct copies of the Terms and Conditions and the Privacy Policy on the sexsearch.com website.

      3.      Attached hereto as Exhibit B is a true and correct copy of a search result for a web search I ran on April 8, 2007 from www.google.com for adult dating websites.

      4.      The following appears on the sexsearch.com home page:

**WARNING: This Site Contains Adult Material**

Explicit pictures, videos, stories, images, or sounds will be contained on this website. If you are under 18 years of age, or if it is illegal to view adult material in your community, you must exit this page now. All models are at least 18 years old, all persons within this site are 18+ and all images are in compliance with 18 U.S.C. 2257

      5.      In order to gain access to the site as a member, all potential members must check the following box that appears on the following web page:

http://ams.sexsearchcom.com/AMS_profile2.php

YOU MUST CHECK THE BOX BELOW TO PROCEED.

I am over 18, I have read and agreed to the terms and conditions and the privacy policy .

      I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on April 13, 2007 in Los Angeles, California.

                        /s/ Dana Milmeister
                        Dana Milmeister

## <u>REQUEST FOR JUDICIAL NOTICE</u>

Specially Appearing Defendants Experienced Internet.com, Inc., Mauricio Bedoya and Patricia Quesada respectfully request that the Court take judicial notice of the fact that there are numerous adult dating websites available for persons to join as members on the internet. (Declaration of Dana Milmeister, Ex. B).

This request is made pursuant to Rule 201 of the Federal Rules of Evidence, which provides that the Court shall take judicial notice of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

The fact that there are numerous adult dating websites is easy to ascertain by a Google search (Ex. B) and not subject to reasonable dispute.

Respectfully submitted,

/s/ Richard M. Kerger
RICHARD M. KERGER (0015864)
Counsel for Specially Appearing Defendant
Experienced Internet.com, Inc.

/s/ Gary Jay Kaufman
Gary Jay Kaufman (*pro hac vice*)
Counsel for Specially Appearing Defendant
Experienced Internet.com, Inc.

25

**EXHIBIT A**

# TERMS & CONDITIONS

By using the SexSearch Website (the "Website") you agree to be bound by these Terms of Use (this "Agreement"), whether or not you register as a member ("Member"). If you wish to become a Member and communicate with other Members and make use of SexSearch, read these Terms of Use and indicate your acceptance of them by following the instructions in the **Registration process**. This Agreement includes SexSearch's **Acceptable Use Policy for Content Posted on the Website**, SexSearch's **Privacy Policy**, and any notices regarding the Website

Note: The materials which are available within this site may include graphic visual depictions and descriptions of nudity and sexual activity and should not be accessed by anyone who is younger than 18 years old or anyone who is offended by such materials or who does not wish to be exposed to such materials.

1. **Acceptance of Terms of Service** By completing the registration process and clicking on the "join" button, you agree to be bound by these Terms of Service and to use SexSearch in a manner consistent with all applicable laws and regulations.

2. **Eligibility** You must be eighteen or over to register as a member of SexSearch or use the Website. Membership in SexSearch is intended for adult use only and is void where prohibited. By using the Website, you represent and warrant that you have the right, authority, and capacity to enter into this Agreement and to abide by all of the terms and conditions of this Agreement. SexSearch reserves the right to terminate your account if we learn that you have provided SexSearch or its personals partner sites with false or misleading registration information.

3. **Termination** Sexsearch may, at any time and at its sole discretion, cancel any paid trial membership or monthly membership; provided, however, that if Sexsearch cancels any paid membership prior to its expiration, Sexsearch shall provide a pro-rata refund for the unexpired period of the cancelled month's membership by automatic credit.

4. **Subscription Cancellation** Sexsearch does not typically provide cash refunds unless extraordinary circumstances apply; we do, however, provide discounts in the event you experience technical difficulties that you demonstrate to have made a sincere effort to resolve. TO CANCEL YOUR MONTHLY MEMBERSHIP YOU MUST NOTIFY SEXSEARCH OF YOUR CANCELLATION BY E-MAIL billing AT LEAST 3 DAYS BEFORE THE EXPIRATION DATE OF YOUR THEN CURRENT MEMBERSHIP TERM, OR YOU MAY SELF CANCEL AS INDICTED IN THE BILLING AREA OF THE SITE HELP SCREEN (HELP).

All cancellations received by Sexsearch will be effective upon receipt.

You hereby acknowledge and agree that if You cancel Your membership, or if Your membership is cancelled by Sexsearch, Your username and password will be removed from the system at the end of the then current membership period and that You will be entitled to receive the full benefits of Your membership until the end of such period. You agree that if You cancel at any time after purchasing a membership to Website (e.g., 20 minutes after You sign up), You will still be charged the full membership fee.

5. **Your Account and Password** You are responsible for maintaining the confidentiality of your member name and password. You are responsible for all uses of its account, whether or not authorized by you. You agree to immediately notify SexSearch of any unauthorized use of its account. You agree to pay all charges that accrue to your account through your use or the use of those authorized by you. You may cancel your account at any time by emailing customer service.

6. **Non Commercial Use by Members** The Website is for the personal use of individual Members only and may not be used in connection with any commercial endeavors. Organizations, companies, and/or businesses may not become Members and should not use SexSearch or the Website for any purpose. Illegal and/or unauthorized use of the Website, including collecting usernames and/or email addresses of members by electronic or other means for the purpose of sending unsolicited email and unauthorized framing of or linking to the Website will be investigated, and appropriate legal action will be taken, including without limitation, civil, criminal, and injunctive redress.

7. **Proprietary Rights in Content on SexSearch** SexSearch owns and retains all proprietary rights in the Website and SexSearch. The Website contains the copyrighted material, trademarks, and other proprietary information of SexSearch, and its licensors. Except for that information which is in the public domain or for which you have been given written permission, you may not copy, modify, publish, transmit, distribute, perform, display, or sell any such proprietary information.

8. **Copyright** SexSearch respects the intellectual property of others, and we ask our users to do the same. If you believe that your work has been copied in a way that constitutes copyright infringement, or your intellectual property rights have been otherwise violated, please provide SexSearch's Customer Service Department the following information:

    a. an electronic or physical signature of the person authorized to act on behalf of the owner of the copyright or other intellectual property interest;
    b. a description of the copyrighted work or other intellectual property that you claim has been infringed;
    c. a description of where the material that you claim is infringing is located on the site;
    d. your address, telephone number, and email address;
    e. a statement by you that you have a good faith belief that the disputed use is not authorized by the copyright owner, its agent, or the law;
    f. a statement by you, made under penalty of perjury, that the above information in your Notice is accurate and that you are the copyright or intellectual property owner or authorized to act on the copyright or intellectual property owner's behalf.

9. **Code of Conduct** You alone are responsible for any content you post on SexSearch, including but not limited to message board posts, chat participation, personal ads and member profiles You agree to not use SexSearch to:

    a. upload, post, email, transmit or otherwise make available any Content that is unlawful, harmful, threatening, abusive, harassing, tortious, defamatory, obscene, libelous, invasive of another's privacy, hateful, or racially, ethnically or otherwise objectionable;
    b. harm or involve minors (those under age 18) in any way;
    c. impersonate any person or entity or falsely state or otherwise misrepresent your affiliation with a person or entity;
    d. forge headers or otherwise manipulate identifiers in order to disguise the origin of any Content transmitted through

SexSearch;

e. upload, post, email, transmit or otherwise make available any Content that you do not have a right to make available under any law or under contractual or fiduciary relationships (such as inside information, proprietary and confidential information learned or disclosed as part of employment relationships or under nondisclosure agreements);

f. upload, post, email, transmit or otherwise make available any Content that infringes any patent, trademark, trade secret, copyright or other proprietary rights ("Rights") of any party;

g. upload, post, email, transmit or otherwise make available any unsolicited or unauthorized advertising, promotional materials, "junk mail," "spam," "chain letters," "pyramid schemes," or any other form of solicitation

h. upload, post, email, transmit or otherwise make available any material that contains software viruses or any other computer code, files or programs designed to interrupt, destroy or limit the functionality of any computer software or hardware or telecommunications equipment;

i. disrupt the normal flow of dialogue, cause a screen to "scroll" faster than other users of SexSearch are able to type, or otherwise act in a manner that negatively affects other users' ability to engage in real time exchanges;

j. interfere with or disrupt SexSearch or servers or networks connected to SexSearch, or disobey any requirements, procedures, policies or regulations of networks connected to SexSearch;

k. intentionally or unintentionally violate any applicable local, state, national or international law and any regulations having the force of law;

l. "stalk" or otherwise harass another;

m. collect or store personal data about other users. or

n. include in your profile any telephone numbers, street addresses, last names, URL's or E-mail addresses other than where asked for it by SexSearch.

**10. Acceptable Use Policy for Content Posted on the Website License and Use of Content** SexSearch does not claim ownership of Content you submit or make available for inclusion on SexSearch. However, with respect to Content you submit or make available for inclusion on publicly accessible areas of SexSearch, you grant SexSearch the following world-wide, royalty free and non-exclusive license(s), as applicable:

" With respect to Content you submit or make available for inclusion on publicly accessible areas of SexSearch the license to use, distribute, reproduce, modify, adapt, publicly perform and publicly display such Content on SexSearch solely for the purposes of providing and promoting SexSearch to which such Content was submitted or made available. This license exists only for as long as you elect to continue to include such Content on SexSearch and will terminate at the time you remove or SexSearch removes such Content from SexSearch.

" With respect to photos, graphics, audio or video you submit or make available for inclusion on publicly accessible area of SexSearch the license to use, distribute, reproduce, modify, adapt, publicly perform and publicly display such Content on SexSearch solely for the purpose for which such Content was submitted or made available. This license exists only for as long as you elect to continue to include such Content on SexSearch and will terminate at the time you remove or SexSearch removes such Content from SexSearch.

" With respect to Content other than photos, graphics, audio or video you submit or make available for inclusion on publicly accessible areas of SexSearch the perpetual, irrevocable and fully sublicensable license to use, distribute, reproduce, modify, adapt, publish, translate, publicly perform and publicly display such Content (in whole or in part) and to incorporate such Content into other works in any format or medium now known or later developed

We reserve the right to excerpt text quotes and pictures from Profiles, along with your handle, and feature them in ads, supplements and content pages in the marketing of SexSearch and its partners. When you create a personal ad, you are given the opportunity to opt out of having your photo excerpted for print publication. By creating a profile with the "Publish my profile (including photo)" box checked, you grant us permission to publish your Personals photo in any SexSearch or personals partner marketing efforts. If you do not want us to use your photo, uncheck the box before previewing or saving a new profile. You can always uncheck this box, however, please note that if you uncheck the box after previewing or saving your profile with the permissions box checked, the change will not be effective for 8 weeks,

**11. Indemnity** You agree to indemnify and hold SexSearch and its subsidiaries, affiliates, officers, agents, co-branders or other partners, and employees, harmless from any claim or demand, including reasonable attorneys' fees, made by any third party due to or arising out of Content you submit, post, transmit or make available through SexSearch, your use of SexSearch, your connection to SexSearch, your violation of the TAC, or your violation of any rights of another.

**12. Limitation on Liability** Except in jurisdictions where such provisions are restricted, in no event will SexSearch be liable to you or any third person for any indirect, consequential, exemplary, incidental, special or punitive damages, including also lost profits arising from your use of the Web site or the Service, even if SexSearch has been advised of the possibility of such damages. Notwithstanding anything to the contrary contained herein, SexSearch's liability to you for any cause whatsoever, and regardless of the form of the action, will at all times be limited to the amount paid, if any, by you to SexSearch for the Service during the term of membership.

**13. Modifications to Service** SexSearch reserves the right at any time and from time to time to modify or discontinue, temporarily or permanently, SexSearch (or any part thereof) with or without notice. You agree that SexSearch shall not be liable to you or to any third party for any modification, suspension or discontinuance of SexSearch.

14. **Dealings With Advertisers** Your correspondence or business dealings with, or participation in promotions of, advertisers found on or through SexSearch, including payment and delivery of related goods or services, and any other terms, conditions, warranties or representations associated with such dealings, are solely between you and such advertiser. You agree that SexSearch shall not be responsible or liable for any loss or damage of any sort incurred as the result of any such dealings or as the result of the presence of such advertisers on SexSearch.

15. **YOU EXPRESSLY UNDERSTAND AND AGREE THAT:**

a. Your use of SexSearch is at your sole risk. SexSearch is provided on an "as is" and "as available" basis. SexSearch expressly disclaims all warranties of any kind, whether express or implied, including, but not limited to the implied warranties of merchantability, fitness for a particular purpose and non -infringement.
b. SexSearch Makes no warranty that
I. SexSearch will meet your requirements,
II. SexSearch will be uninterrupted, timely, secure, or error -free,
III. the results that may be obtained from the use of SexSearch will be accurate or reliable;
IV. the quality of any products, services, information, or other material purchased or obtained by you through SexSearch will meet your expectations, and
V. any errors in the software will be corrected.
c. Any material downloaded or otherwise obtained through the use of SexSearch is done at your own discretion and risk and that you will be solely responsible for any damage to your computer system or loss of data that results from the download of any such material.
d. No advice or information, whether oral or written, obtained by you from SexSearch or through or from SexSearch shall create any warranty not expressly stated in the TAC.

16. **Changes to this Privacy Policy SexSearch may update this policy.** We will notify you about significant changes in the way we treat personal information by sending a notice to the primary email address specified in your SexSearch account or by placing a prominent notice on our site

17. **Emails** By registering as a member of this Site you agree to accept from time to time such emails as members of SexSearch or SexSearch itself shall send to the designated email address unless you specifically request otherwise by modifying your membership preferences. You must also read and agree to our Privacy Statement. You acknowledge that (a) we cannot ensure the security or privacy of information you provide through the Internet and your email messages, and you release us from any and all liability in connection with the use of such information by other parties; (b) we are not responsible for, and cannot control, the use by others of any information which you provide to them and you should use caution in selecting the personal information you provide to others through the Service; and (c) we cannot assume any responsibility for the content of messages sent by other users of the Service, and you release us from any and all liability in connection with the contents of any communications you may receive from other users. We cannot guarantee, and assume no responsibility for verifying the accuracy of the information provided by other users of the Service.

18. **Severability & Headings** If any provision herein is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force without being impaired or invalidated in any way. Headings are for reference purposes only and in no way define, limit, construe or describe the scope or extent of such section.

# PRIVACY POLICY

## SexSearch Privacy Policy Statement

This Privacy Policy Statement sets forth the policies and practices with respect to information or data gathered regarding paying and non-paying members of this Site. This is an adult Site that expressly and strictly limits its membership to adults. All persons under the age of majority in their jurisdiction are strictly prohibited from accessing or viewing the contents of this Site.

This Site does not knowingly seek or collect any personal information or data from persons under the age of majority.

Notice - Use of website by the paying or non-paying member constitutes the paying or non-paying member's express consent to the Use of Personal Information Collected by Site.

CAREFULLY READ THIS PRIVACY POLICY STATEMENT. BY YOUR USE OF THIS SITE YOU WILL BE EXPRESSLY SIGNIFYING THAT YOU AGREE TO THIS POLICY STATEMENT AND THAT YOU ASSENT TO THE USE OF ANY PERSONAL INFORMATION THAT YOU SUPPLY OR THAT IS COLLECTED ABOUT YOU AS DETAILED IN THIS POLICY STATEMENT.

IF YOU DO NOT EXPRESSLY AGREE WITH ALL OF THE TERMS OF THIS PRIVACY POLICY STATEMENT YOU SHOULD NOT JOIN OR USE THIS SITE.

## What Information About Paying and Non-Paying Members is Collected?

This site does not **at any time** collect credit card numbers and expiration dates. That information is collected by your credit card processor **only.**

When any adult consumer signs on as a paying or non-paying member of this Site, that consumer may be required to provide certain personal as well as demographic information which may include, but is not necessarily limited to, the paying or non-paying member's name, address, birthday, e-mail address, gender, marital status, occupation, education, username and password, and special interests or affiliations. This Site collects any and all such information and includes it in its customer database.

If the Site features or conducts any special events, special promotions or offers, contests or polls, a paying or non-paying member of the Site may be asked to provide information in order to participate. If the paying or non-paying member voluntarily provides that information, all such information may be collected by the Site and included in its customer database.

When a paying or non-paying member of this Site requests webpages from the Site's server or clicks on banners or other hypertext links, the Site will automatically collect some information or data about the paying or non-paying member, including the paying or non-paying member's IP address, the information that is collected may also indicate any special preferences or requests of the paying or non-paying member; all that information and data will be collected by the Site and included in its customer database.

If a paying or non-paying member sends any personal communication or correspondence, by any means, to the Site, or any of its employees, agents or representatives, the Site may collect any information regarding that communication and include that information in its customer database.

The Site may also automatically collect traffic and click-through data as well as information regarding the online behavior of paying or non-paying members - any information about paying or non-paying members collected by the Site through the use of programming means may be included in its customer database.

## Use of Personal Paying or non-paying member Information.

By the paying or non-paying member's use of the Site, the paying or non-paying member expressly agrees to receive offers and emails from SexSearch.

Please note that personal information about a paying or non-paying member may be collected by a third-party web service provider that has an advertising banner or link on the Site.

The Site is not responsible or liable for the use of any information that a paying or non-paying member may provide, or that is gathered by third-party websites that have banner ads or links on the Site. This Site does not control, monitor or endorse the information gathering practices or Privacy Policies of any of those third-party websites.

Whenever applicable, each paying or non-paying member should seek to read the Privacy Policy of any third-party website provider that has an advertising banner, advertises or has a link on the Site.

## Security of Personal Information Collected by the Site

Consistent with the Policies set forth in this Privacy Statement, the Site has adopted and implemented reasonable and technologically feasible procedures for maintaining the security, accuracy and integrity of all personal information relating to paying or non-paying members that is collected by the Site.

All paying or non-paying members should consider any information provided to or collected by the Site as non-confidential, and consequently the Site assumes no liability or responsibility if any information relating to any paying or non-paying member is intercepted and/or used by an unintended recipient.

## Use of Personal Information

In the event that any fraudulent claims are made on any of your personal transactions, be advised that we reserve the right to add to your account return fees as administered by the processor and collection costs when applicable. Additionally, we reserve the right to refer uncollected balances to third party collection agencies to investigate any returned bank/bankcard transactions.

## "OPT-IN" and "OPT-OUT" Provisions

There may be occasions when a paying or non-paying member will be presented with special offers either from the operators of the Site or from third-party service or content providers, which may include consent to receive e-mail solicitations, communications, newsletters, commercial advertising, or other promotional or special event materials (collectively referred to as "Offers").

"OPT-IN" – Some Offers may be presented to the paying or non-paying member with the option to express the subscriber's

Case 3:07-cv-00604-JZ   Document 123   Filed 04/13/2007   Page 36 of 41

preference by either clicking or entering "accept"(alternatively"yes") or "decline" (alternatively "no"). By selecting or clicking the "accept" or "yes" the paying or non-paying member indicates that the paying or non-paying member "OPTS-IN" to that Offer and thereby agrees and assents that the paying or non-paying member's personal information and data may be disclosed to third-parties.

"OPT-OUT" – Other Offers may be presented with a pre-selected preference or choice. If the paying or non-paying member does not deselect the pre-selected preference of choice (i.e. "OPT-OUT" of the Offer) then the Site may transfer the paying or non-paying member's personal profile information to the third-party service or content provider making the Offer. If the paying or non-paying member deselects the pre-selected preference then no personal information about the paying or non-paying member may be disclosed to any third-party service or content provider.

## Terms and Conditions of Membership

Each paying or non -paying member should carefully read each of the terms and conditions of Membership of this Site. By accepting membership to this Site you are unconditionally accepting all of those terms and conditions. Some of those terms and conditions may also affect the right of this Site to use information that it has gathered from paying or non-paying members.

In the event of any conflicts between the Membership Terms, the Terms and Conditions and this Privacy Policy Statement, the provisions of this Privacy Policy shall prevail.

| Kitts Kat Marketing | Stallion.com FSC Limited | CYTEK Limited |
|---|---|---|
| PO Box 1058 | 12 Kingslyn Avenue | 48 Wilmot Road |
| Basseterre, | Kingston 10, | Dartford, Kent, UK |
| St. Kitts | WI N/A | DA1 3BA |
| East Caribbean | JM | |

FORGOT PASSWORD?    PRIVACY    TERMS / CONDITIONS    CUSTOMER SUPPORT    AFFILIATES

**EXHIBIT B**

Looking for real sex? Sex Search Hot partners with AdultFriendFinder                     Page 1 of 3

## Category: Adult Dating


### Adult Friend Finder

**Rating:** ⭐⭐⭐⭐⭐

**Description from the site:** Looking for real sex? Find someone now on the largest AdultFriendFinder sex personals network. FREE signup! Post a FREE erotic ad w/5 photos, flirt in chatrooms, view explicit live Webcams, meet adultsingles for REAL sex! AdultFriendFinder.com

More…


### Alt.com

**Rating:** ⭐⭐⭐⭐⭐

**Description from the site:** Looking for BDSM partners? Meet someone now on the largest BDSM personals site – photos, chat, more!

More…


### WildMatch

**Rating:** ⭐⭐⭐⭐⭐

**Description from the site:** Meet real sexy singles tonight. Find Hot & WildGirls

More…


### Swapfinder.com

**Rating:** ⭐⭐⭐⭐⭐

**Description from the site:** SwapFinder is the World's Largest Personals Site for Partner Swapping. Search for couples you're looking for with exclusive swap preferences options.

More…


### Mate1.com

**Rating:** ⭐⭐⭐⭐

**Description from the site:** The web's largest intimate dating site, with millions of members in the U.S. and worldwide. Sign up today, 100% FREE.

More…


### Sexsearch.com

**Rating:** ⭐⭐⭐⭐

**Description from the site:** Adult personals and free online adult dating service. Search adult swingers and couples personal classified ads. Sexsearchcom

More…


### Amateurmatch.com

**Rating:** ⭐⭐⭐⭐

**Description from the site:** Find your sex partner in your area. Get Laid at AmateurMatch

More…

Looking for real sex? Sex Search Hot partners with AdultFriendFinder                Page 2 of 3



### Adult Iwantu

**Rating:** ★★★★☆
**Description from the site:** Live out your sexual fantasies and discover a new playmate or swingers with IwantU.com
More...



### Swinglifestyle.com

**Rating:** ★★★★☆
**Description from the site:** Adult Swingers Personals. Create a Free Swingers Account. Start your Sexual Revolution - Join our adult swingers today.
More...



### Eroticy.com

**Rating:** ★★★★☆
**Description from the site:** The hottest adult dating and erotic personals community online featuring over 3 million uncensored personal ads
More...



### SexyAds

**Rating:** ★★★★☆
**Description from the site:** Real People Actively Seeking Sexy Good Times. Excellent Search & Browse Criteria. Full Service Internal Email. Meet wonderfully friendly and sexy people right here right now!
More...



### Hotmatchup.com

**Rating:** ★★★★☆
**Description from the site:** Meet adult singles online, Hot and steamy online personals service. HotMatchup.com
More...



### Swappernet

**Rating:** ★★★★☆
**Description from the site:** Swappernet.com : The premier online community for swingers. Looking to satisfy your swinging lifestyle? Join today to meet local wife swappers and many more.
More...



### AdultLocals.com

**Rating:** ★★★☆☆
**Description from the site:** Find hot singles, couples, swingers and other passionate people just like you
More...



### Adult MatchDoctor

Looking for real sex? Sex Search Hot partners with AdultFriendFinder

**Rating:** ★★★☆☆

**Description from the site:** Adult personals and swinger site. Search our database and anonymously email sexually-liberated singles in your area that are looking to have sex tonight! Post a profile, search, chat, and more for free!

More...

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been electronically filed this 13th day of April, 2007.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's System.

/s/ Gary Jay Kaufman

26