UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

John Doe,

               PLAINTIFF,

vs.

SexSearch.com, et al.,

               DEFENDANTS.

Case No.: 3:07-cv-604

Judge Jack Zouhary

RESPONSE TO ALL DEFENDANTS'
MOTIONS IN OPPOSITION TO MOTION FOR
A PRELIMINARY INJUNCTION
(DKT. #92, #93, #95, #97, #104)

Now comes Plaintiff, John Doe, by and through his undersigned Counsel and respectfully

submits his response to all Defendants' motions in opposition to Plaintiff's motion for a preliminary

injunction (Dkt. #92, #93, #95, #97, #104) for the reasons contained in the attached brief.

1

## RESPONSE TO DEFENDANTS' OPPOSITION TO A PRELIMINARY INJUNCTION

### I.     INTRODUCTION

Defendants' assert that they have surmised Plaintiff's legal issues in his criminal case. However, contrary to their contentions that Plaintiff is seeking to establish "reasonable doubt in his upcoming criminal trial," the sole issue for Plaintiff in the criminal case will be Plaintiff's mens rea. There is nothing about the outcome of instant matter which affects that assessment.  Said issue is left the sole determination of an impaneled jury.  Plaintiff is scheduled for trial and that trial is inevitable. Said trial will most assuredly take place prior to any potential settlement negotiations and/or a trial in the instant Matter.  Any litigation with regard to Plaintiff's claims against Sexsearch Website, are irrelevant as a matter of law in the criminal trial.  Defendants' seek to distract this Honorable Court with a red herring.

Plaintiff recognizes Defendants' apparent attempts to continually portray Plaintiff as a reprobate for meeting a SexSearch member, and then, engaging in sexual contact with her.  The Sexsearch Websites' disdain for that behavior by two (2) of its members is hypocritical as it takes money from members promising that exact experience.  "Real People, Real Sex" is Defendants' catch phrase, not Plaintiff's.

Plaintiff enjoys the presumption of innocence in his criminal case as does every Defendant in a criminal action.  State v. Lane, 60 Ohio St.2d 112 (1979) citing Coffin v. United States, 156 U.S. 432 (1895).  This is perhaps the most fundamental component of a fair trial.  Making personal attacks against Plaintiff in Defendants' pleadings will not undermine this presumption.  It is a fact that his conduct has not yet been determined to be criminal.  Plaintiff seeks to keep Defendants on point; this is a civil action against the Sexsearch Website and not a criminal case.

Defendants' seek denial of Plaintiff's Motion on three (3) separate grounds:

2

1. Plaintiff cannot obtain the relief sought based on their assessment of <u>Grupo Mexicano De Desarrollo, S.A v. Alliance Bond Fund, Inc.</u>, 527 U.S. 308 (1999);

2. Plaintiff's claims under the Ohio Consumer Sales Practices Act (hereinafter is referred to as "OCSPA") are pre-empted by the Communication's Decency Act (hereinafter referred to as "CDA"); and finally,

3. Plaintiff has raised no evidence for the relief sought.

Plaintiff will demonstrate that the answers to all issues posed by Defendants' are favorable to Plaintiff. Plaintiff can obtain relief despite Defendants' contention that <u>Grupo</u> is controlling precedent, the "OCSPA" was never preempted by the "CDA," and finally, Plaintiff has raised ample evidence to demonstrate the relief sought is proper.

## A. <u>GRUPO'S</u> APPLICABILITY TO THE CASE AT BAR

The U.S. Supreme Court case of <u>Grupo Mexicano De Desarrollo, S.A v. Alliance Bond Fund, Inc.</u>, 527 U.S. 308 (1999) is inapplicable for reasons that will be addressed below. Defendants' falsely assure this Honorable Court that as to the issue of <u>Grupo</u> "[n]o further analysis is needed; this case is dispositive." Dkt. 93 at 2. Defendants' scrutiny of <u>Grupo</u> is flawed.

Defendants' claim <u>Grupo</u> stands for the proposition that "the Court may not freeze or otherwise alter any of the Defendants' assets." Dkt. #93 at 4. Defendants are wrong. Plaintiff is seeking to make the current injunction (Dkt. # 11) permanent to preserve the status quo of the business operation known as the Sexsearch Website. Defendants are relying in whole or part on the original Ex parte Motion seeking a Temporary Restraining Order. At this juncture, Plaintiff merely seeks to maintain the status quo as all parties have made appearances.

<u>Grupo</u> is inapplicable to the instant Matter for the foregoing grounds:

1. the relief requested in the Complaint is money damages <u>and</u> an injunction;

2. the Complaint contains equity causes of action (e.g. fraud, failure to warn); and

3.    the injunction does not freeze assets. Exhibit 1, <u>Grupo</u> Case Law Chart.

The current injunction, which Plaintiff seeks to make permanent, does not freeze Defendants' assets.   Dkt. # 11.  Plaintiff's Complaint contains both money damage claims (e.g. breach of contract) and equity claims such as fraud, deceptive trade practices, failure to warn, etc.  See, Dkt. #1.  Plaintiff's Complaint seeks money damages relief and a permanent injunction barring Defendants from engaging in the deceptive trade practices listed in the Complaint.  <u>Id.</u>  Multiple courts have distinguished <u>Grupo</u> on precisely these bases.

<u>Grupo</u> does not apply in cases involving money damage claims (e.g. breach of contract) and equity claims.  <u>Slidell v. Millennium</u>, 2002 U.S. Dist. LEXIS 7064 (2002); See also, <u>Fairview v. Oakbrook</u>, 77 F.Supp.2d 199 (1999).  <u>Grupo</u> does not apply if relief requested is more than money damages.  (e.g. injunction).  <u>Slidell</u> at *1059.  <u>Grupo</u> does not apply in cases in which the requested injunction does not freeze assets.  In <u>Walczak v. EPL Prolong</u>, 198 F.3d 725 (1999), the court distinguished <u>Grupo</u> and upheld a "no liquidation" injunction identical to the injunction sought in this case.

> We hold that the injunction in this case is distinguishable from the
> injunction in <u>Grupo Mexicano</u>.  Here, the effect of the preliminary
> injunction was not to 'freeze' Appellants' assets.  Rather, the injunction
> appropriately <u>preserved the status quo</u> and prevented the irreparable loss
> of rights before judgment.

Barahona-Gomez v. Reno, 167 F.3d 1228, 1234 (9th Cir.1999), emphasis added.  This Court has held that "[d]efendants will not be harmed by the imposition of this very-narrow Order, because it merely compels certain Defendants to continue to operate their businesses without <u>liquidating</u> assets to evade jurisdiction and potential judgments.  Plaintiff has shown that a narrowly tailored temporary restraining order which <u>preserves the status quo</u> is appropriate."  Dkt. #11 at 3.   Emphasis added.  Plaintiff simply seeks to continue to keep this Order in place.

The court's granting of a preliminary injunction is consistent with the existing Temporary Restraining Order is a proper exercise of this Honorable Court's authority given the distinctions between <u>Grupo</u> and the other cases outlined.

### B. PREEMPTION

Defendants' maintain that "OCSPA" is preempted by the enactment of the "CDA." Their contentions are without merit.

> The preemption of state law causes of action is mandated, in certain circumstances, by the Supremacy Clause of the United States Constitution, which directs that 'the Laws of the United States…shall be the Supreme Law of the Land; and the judges in ever State shall be bound thereby, any Thing in the Constitution of Law of any State to the Contrary notwithstanding.'

<u>Zeran v. American Online, Inc.</u>, 958 F.Supp. 1124 (1997) citing U.S. Const. art. VI §2; see also, <u>McCulloch v. Maryland</u>, 17 U.S. 316 (1819). "Preemption clause analysis properly being with 'the assumption that Congress did not intend to displace state law.'" <u>Id.</u> citing <u>Maryland v. Louisiana</u>, 451 U.S. 725 (1981). In essence, the analysis under preemption is whether federal laws via statutes, regulation, and/or treaties should preempt or prevail over any <u>inconsistent</u> state law whether it is in the form of a state constitution, regulation, and/or statute. It is the notion that Congress intended to displace or oust state law in any given area. States however can complement federal law. Federal law is the ceiling and the state law is the floor. States are clearly able to grant rights more extensive than their federal counterparts as long as those rights are no inconsistent. There are essentially two (2) forms of preemption:

1. express or implied; or

2. a direct conflict

<u>Id.</u> at 1129 citing <u>Feikema v. Texaco, Inc.</u>, 16 F.3d 1408, 1412 (4th Cir. 1994).

5

In the instant Matter Defendants' argue that "Plaintiff's claims that the T[erms][]A[nd][]C[onditions] violated the Ohio Consumer [sic] Practice Act (the "Act") and are unconscionable are likewise misplaced.  The CDA pre-empts the Act."  (Dkt. #93 at 3).  Defendants do not assert which form of preemption is applicable in the case <u>sub judice</u>.  There is clearly no expressed provision in the "CDA" found at 47 U.S.C. Section 230 preempting the "OCSPA."   47 U.S.C. §230. And, there is no direct conflict between the language of the "OCSPA" and the "CDA" which would render an apparent conflict.  <u>Id.</u>  Therefore, the only reasonable assumption would be that Defendants' are arguing there is an implied preemption.  However, within the "CDA" there is a subsection directly on point it reads in pertinent part:

> (e)  Effect on other laws.
>
> (3)  State law.  Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section.  No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

<u>Id.</u>  The Northern District of California addressed this issue in <u>Anthony v. Yahoo!, Inc.,</u> 421 F.Supp.2d 1257 (2006).  The <u>Anthony</u> case involved deceptive profiles which Anthony alleged were deliberately posted by Yahoo! in an attempt to seduce membership, and also, that Anthony was forwarded expired profiles.  <u>Id.</u>  Yahoo! argued that the "CDA" barred his claims for fraud and negligent misrepresentation.  <u>Id.</u>  Yahoo! also claimed that it could not be held liable based on the profile content under the "CDA."  <u>Id.</u>  The District Court found that those claims swept too broadly.  <u>Id.</u>  The District Court was aware of no case where a defendant was immunized under the "CDA" from allegations that it created tortious content.  <u>Id.</u>  The <u>Anthony</u> Court then went on to differentiate all of the prior cases involving the "CDA" only to surmise that the "CDA" applied to invasion of privacy, misappropriated of the right of publicity, defamation and negligence claims relating to a third party's creation of a false

6

profile using Plaintiff's identity.  Id.  The "CDA" only immunizes information provided by another information content provider.

In Anthony this issue was whether Yahoo! actually created the fraudulent profiles.  In the instant action, the issue is whether under the "CDA" the degree of control over the profiles that the Sexsearch Website maintains is to such a degree that it would be labeled as an Information Content Provider under section (f)(3) rather than the immunized Interactive Computer Service Provider under section (f)(2).

An Information Content Provider is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. §230(f)(3).  An Interactive Computer Service Provider under section (f)(2) is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such system operate or services offered by libraries or educational institutions."  The Sexsearch Website reserves the right, and does in fact, modify the content of profiles when they do not meet the profile guidelines and as such they are responsible in whole or part for the creation of development of the information.  Dkt. #9, Exhibit 84 at p. 233, 234.  Therefore, it follows that they are an Information Content Provider that finds no immunity under the "CDA."

Anthony was successful even though third parties created the profiles because the "CDA" only protected Yahoo! as a publisher or speaker and not against his claims of misrepresentation because Anthony challenged the manner of presentment the fraudulent, rather than, the underlying profiles themselves.  That is precisely why Plaintiff is asserting the content of the profiles are not at issue.  It is the fact that a minor was on the Sexsearch Website and not the content of that minor's profiles that is at issue.  It is the difference between apples and oranges.  As a side note, new information has come to

light which would tend to indicate that the Sexsearch Website may be engaging in the creation of fraudulent profiles.  Plaintiff will soon be amending his Complaint to add additional causes of action similar to those articulated in <u>Anthony</u>.

Plaintiff contends based on the foregoing that Sexsearch Website is an Information Content Provider under the "CDA" and as such has no immunity, that the content of the pages are not at issue, consequently, the "CDA" is inapplicable, and finally, the "CDA" does not preempt state law with respect to claims, other than, those claims relating to defamation or the resultant causes of action.

### C.  PLAINTIFF HAS RAISED NO EVIDENCE FOR THE RELIEF SOUGHT

Plaintiff raised evidence previously admitted for the relief sought in the case <u>sub judice</u>.  Dkt. #9, #39.  This Honorable Court previously found that information to be credible and reliable. Defendants' also concede that there are at least relationships and/or involvement with the Sexsearch Website as to all Defendants in the instant Matter.  Defendants' Counsel never revealed prior to the Motion that there was a licensing agreement.  Additionally, we do not know the terms of the agreement with regard to termination dates or any such provision relating to liability, therefore, we would have a good faith basis to raise any claim against any person who either owns and/or operates the Sexsearch Website.  These agreements may place liability on one party or another, those parties may share all liability, or may apportion liability to one party or another only under certain circumstances.

Again, this system of veiled ownership was specifically designed to prevent lawsuits.  Dkt. #11. It is evident from their business model that they operate in such a fashion as to hide both the true owners and operators.  Furthermore, their claims that all of the monies which are generated by the Sexsearch Website are retained by Cytek Limited is arguable given that Plaintiff's funds were sent directly to Experiencedinternet.com Inc. as indicated by the billing company's records for Plaintiff. Exhibit 2.  Experiencedinternet.com Inc is receiving compensation from Sexsearch Website directly.

Indeed no Defendants in this Cause of Action have evaded this Honorable Court's jurisdiction, but the point is arguable about whether they would have sought to evade jurisdiction, had this Honorable Court not originally issued the Temporary Restraining Order.  Clearly, some Defendants' have been lackadaisical about acquiring counsel as indicated by the most recent Notices filed on behalf of said Defendants.  Dkt. #73, #74, #91, #96, #103 and #108 identifying Attorney Appearances on behalf of six (6) separate Defendants all filed within the last ten (10) days.

Again, the relationship of all Defendants to the Sexsearch Website has yet to be determined given that all Defendants, other than, Moniker who has since been dismissed, have complied with the Court's informal discovery request.  Additionally, it is quite telling that Plaintiff has not only complied with discovery requests in a timely manner giving forth all exhibits, yet has received nothing in return in the exchange.  It would seem that this exchange was in fact a sham.  Is Plaintiff the only party held accountable to any standard?  Plaintiff again respectfully requests this Honorable Court continue the previously imposed Temporary Restraining Order in the form of a Preliminary Injunction.

## II.    OTHER AREAS ARGUED BY DEFENDANTS' IN INTRODUCTION AND LATER PORTIONS OF THEIR MOTION

### A.   ASHCROFT vs. ACLU IS INAPPLICABLE

Defendants' references to Plaintiff's counsel's comments are inaccurate and decontextualized with respect to an interview that took place for XBIZ website along with Defense Counsel.  Once more, they are clearly demonstrating no civility in the law and are arguably making personal attacks on Counsel.

Defendants' allude to Ashcroft v. ACLU, 542 U.S. 656 (2004) as though it is somehow dispositive of Plaintiff's claims being meritorious.  Ashcroft v. ACLU involved the Child Online Protection Act hereinafter referred to as "COPA."  That case is summarized by the court as follows: "COPA is the second attempt by Congress to make the Internet safe for minors by criminalizing certain Internet

speech." Id. at 2789.  Nothing about Plaintiff's Complaint involves the "COPA," internet speech, criminalization of same, or making the entire Internet safe for minors.  Plaintiff is not a minor.  None of Plaintiff's claims seek damages for harm to a minor.  Rather, he seeks, in part, damages for the Sexsearch Websites' representations about minors or the lack thereof.

"It is incredible that Plaintiff did not even question a 14-year-old's age…." Dkt. #93 at 2.  Defendants' claim no fourteen (14) year olds are on their site.  They review profiles prior to posting them for inappropriate content including references to fourteen (14) year olds and other minors.  Dkt. #39, Exhibit 84, p. 233.  They review images prior to posting them to insure they do not include fourteen (14) year olds, along with other minors.  Id.  However, they have permitted fourteen (14) year olds to become members in the past on at least one (1) occasion, case in point, Jane Roe.  They also permit any other fourteen (14) year olds with a credit card, which minors can lawfully obtain, to become a member.  What is truly incredible is that Defendants' run a business that openly permits fourteen (14) year olds to become members, including those who are able to parlay their membership into conduct trapping adults into potentially criminal liability.

"The main basis of Plaintiff's case is the following warning to minors that appears on the home page of the site:" Dkt. #93 at 2.  This statement is false.  Plaintiff's claims are contained in a multi-page Complaint including over three hundred (300) separate paragraphs.  Those claims are not reducible to Defendants' abbreviated sentence above.  Plaintiff was required to agree to all Terms and Conditions to become a member of the Sexsearch Website, pay a fee, agree to comply with Defendants' Profile Guidelines, and submit his profile and profile images to the approval of Defendants prior to Defendants' posting the information.  Id.  Throughout his enrollment and his membership with the Sexsearch Website, Defendants' warranty was plainly posted on the main page of their site.  Dkt. #93 at 2.

"He knew that is all Jane Roe had to do, and his reliance on the site to protect him from

10

having sex with a minor is misplaced and unreasonable." Defendants' admission concedes the operation of a criminal enterprise. To wit: Knowingly facilitating sex between adults and children in violation of Ohio Revised Code Section 2907.07. Further, Defendants' business advertises a "Gold Room" with what is boasted as the "Internet's Largest Hard Core Porn Site." Dkt. #39, Exhibit 84 at p. 236. Defendants' admission that the site permits minors to become members admits a violation of Ohio Revised Code Section 2907.31 - Disseminating matter harmful to juveniles. The court will note that Section 2907.31 has a mental state of recklessness. Defendants' claim that Plaintiff's reliance is misplaced necessarily admits that they are aware that the structure of their site and business model permits children to access the "Internet's Largest Hard Core Porn Site." Id. Plaintiff was not informed he was joining a criminal enterprise which was and is currently recklessly harming minors. Defendants have presented no evidence demonstrating potential SexSearch members are so warned.

"An injunction of the magnitude that Plaintiff seeks would cause great and irreparable injury to the defendants…." Dkt. #93 at 4. Plaintiff seeks a preliminary injunction consistent with the current Temporary Restraining Order. Dkt. #11. That Temporary Restraining Order began March 2, 2007, over forty (40) days ago. Id. Defendants have provided no basis for the blanket statements about the harm they would suffer were the injunction to continue during the pendency of the lawsuit. They have not been greatly harmed, much less irreparably injured, and their willingness to have continued the restraining order, for their convenience, demonstrates this fact. This Cause of Action has now proceeded some forty (40) days under this restraining order, with no support for a claim that they have been injured or reasonably expect to be injured in the future.

Defendants' claim that all the corporate entities have "have timely maintained all corporate formalities, timely filed all taxes due in their respective jurisdictions, and have facilitation, licensing and consulting agreements in place as appropriate with respect to operating the site." Dkt. #93 at 4. These statements are unsupported by any evidence. Mere argument by Counsel or unsworn

declarations is and should be unpersuasive on these issues and prohibits meaningful confrontation that is the hallmark of our justice system. Although Plaintiff has requested discovery from each of the Defendants and the court has ordered they provide it Dkt. #110, none has been provided as of this writing. In contrast, this Honorable Court has ordered the filing and sharing with all Defendants of all evidence Plaintiff has amassed in support of the Temporary Restraining Order as well as all evidence acquired through other Defendants without a reciprocal order on all other Defendants. Particularly in light of this obvious imbalance of information, these unsubstantiated assertions by Counsel should be disregarded. It is easy to manufacture an answer to all questions posed when you have all strategy and exhibits of Plaintiff prior to your appearance in court without divulging anything to Plaintiff in return. This is supposed to be a level playing field.

### B.  PLAINTIFF IS ENTERING THIS LAWSUIT WITH CLEAN HANDS

Defendants' claim that Plaintiff comes to this Case with unclean hands is erroneous. He has the presumption of innocence. He has never been convicted of any crime, and very well, may never be. The doctrine of unclean hands applies more readily to Defendants. They are operating a business that admits consent to children's access to the "Internets Best Hard Core Pornography," and simultaneously, advertises to adults seeking to have sex with children. Dkt. #92, #93, #95, #97, #104. Defendants' openly admit they cannot prevent children from seeing such material and meeting adults for sex, yet they still continue to own and/or operate that multi-million dollar business. Id. Moreover, they operate in the backroom shadow of a company using a business model that "[has] been designed with a system of veiled ownership, divided assets, misnamed corporations, and hidden information, for which there is no legitimate business purpose." Dkt. #11 at 2. We pose this question: If you own a car and lease every part of the car to various individuals and/or corporations outside of the United States, but actually maintain control of the most valuable asset the gas tank who would you bring the lawsuit against; the owner, the driver, and or all lessees? All potential defendants is the answer to the question

12

posed. That is what Plaintiff has done. The Defendants' business model is not a trade secret; it is designed to create this system of veiled ownership in an attempt to evade the jurisdiction of any court, and thus far, they have been successful.

### C.  PLAINTIFF REASONABLY RELIED ON THE LANGUAGE SET FOR ON THE SEXSEARCH WEBSITE

Again, Ashcroft v. ACLU, 542 U.S. 656 (2004) dealt with a statute imposing civil and criminal liability upon Internet sites exposing minors to pornography. The court struck the statute citing the challengers' First Amendment rights. The claims in Plaintiff's Complaint are breach of contract, fraud, deceptive business practices, failure to warn, etc. His claims concern a business purporting to prevent minors from participating in its service, then, failing to honor that promise. There is no First Amendment question at issue in Plaintiff's Complaint. Likewise, Defendants do not allege that one exists. Plaintiff is not seeking damages for harm to any minor. He is not seeking damages relating to any minor's access to pornography. The issues Defendants' claim relates to Ashcroft are irrelevant.

Ashcroft prohibits punishment of sites that fail to protect minors from accessing adult content. It does not prohibit judgments against sites that promise to introduce adults to other adults for sex, yet introduces those adults to children, posing as adults. It does not prohibit judgments for sites which fail to warn paying members that the service they are paying for includes the reality they will be speaking with, exchanging images with, meeting and engaging in sex with minors, a crime. There is a good reason that Defendants do not warn potential customers of that risk – no reasonable adult would join the site after being warned they could be committing a crime while using the site as it was intended to be used. The defendants' argument here is that "everyone knows there are kids available for sex with adults on our site." It is despicable, and this Court and all parents of children in Ohio ought to be distressed by such an admission. The Internet is not a lawless free-for-all for pornographers recklessly soliciting minors for sex with adults and charging those minors a fee to expose them to the "Internet's

Largest Hard Core Pornography."  Dkt. #39, Exhibit, 84, p. 236.  The Defendants "everyone knows we do this to children" argument should be rejected by this Honorable Court, both legally and morally. Finally, Defendants' know exactly how to insure their members are adults they explicitly reveal how that can be accomplished via a statement on their site.

    At http://www1.sexsearchcom.com/custodian_of_records.php Defendants have posted the following content.

    Sexsearch obtains images and other adult content only from third party content providers who represent in writing that they only use models that are at least 18 years of age and maintain age verifications records required by the Federal government and pursuant to 18 U.S.C. 2257.

    Custodian of Records:
    David Rickham
    12 Kingslyn Avenue
    Kingston 10, Jamaica

    In compliance with the Federal Labeling and Record-Keeping Law (also known as 18 U.S.C. 2257), all models located within our domain were 18 years of age or older during the time of photography. All models proof of age are held by the custodian of records, which are listed above and organized by producer. All content and images are in full compliance with the requirements of 18 U.S.C. 2257 and associated regulations.  (Emphasis added).

    Defendants' employ a record's custodian who holds the requisite "proof of age" documents. The Sexsearch Website has the capacity, therefore, to retain such documents on its members. Defendants' claim that they cannot assure that their members are eighteen (18) years of age or older is contradicted by their ability to fulfill their duty, under 18 U.S.C. 2257.  They can assure their members are eighteen (18) years of age or older, they merely choose not to do so.  This choice is to maximize profit in spite of the very real risk – in this case the realized risk – child members they solicit, enroll, and promote will be sought after by adults for the purpose of engaging in sexual activity.

    The fact that Jane Roe became a member was the result of a conscious, financially motivated, choice by Defendants' purported ignorance to a known risk based upon their cost calculations.  In this

Matter, their financial gamble is not paying off. The question is how many times has it paid off in the past?

### D. COMMUNICATION DECENCY ACT DOES NOT PREEMPT PLAINTIFF'S TORT CLAIMS

Under the "CDA," Defendants are Information Content Providers. They are not an Interactive Computer Service Providers. Their status does not trigger "CDA" immunity. See, prior argument in earlier paragraphs for a more thorough explanation. Again to reiterate, Plaintiff is not suing Defendants for content at this juncture nor is Plaintiff asserting that the failed to implementation of the basic safety measure to prevent sexual predators from communicating with minors, to the contrary, Plaintiff asserts that Defendants' breached their obligation to Plaintiff when they allowed a minor join the Sexsearch Website. It almost does not pass the laugh test that they would even raise such an argument given some of the websites they own and control with names like Devirginized.com and Freeteenslits.com where they openly advertise for people who would seek children out for sex. There will be additional evidence elicited at the preliminary hearing to support this contention. See, Moniker Discovery, to be filed under seal. Defendants' draw correlations between a case that is inapplicable on its facts. Plaintiff has not filed a claim on behalf of Jane Roe; clearly, Jane Roe's parents may do so in the near future. This potential is likely the catalyst for Defendants' desperation to get out from under the consequences of their scheme now without providing any information to continue to operate in virtual anonymity shielding assets, true ownership, and website operation.

### E. NO ONE CONTROLS THE SEXSEARCH WEBSITE

The Defendants claim none of them are directly responsible for the operation of the Sexsearch Website. That is an incredulous statement. What is direct responsibility entail? If that be the case then do they have standing to challenge the injunction? Given that they claim they have licensing agreements with Cytek Limited, all other parties obviously have the means to join that indispensable

party. While steadfastly claiming they have independent corporations, separate shareholders, etc. no evidence has been supplied to sustain such a claim. In fact, currently Defendants have supplied no informal discovery even despite the court's direct Order to do so. Dkt. #110. Agreed Dismissal for non-owner and/or operator Defendants is within their grasp by merely providing sufficient answers to our informal discovery, under oath, yet they fail to do so. Wayne (last name unknown) is an account manager for the affiliate program of the Sexsearch Website. He disclosed that his paychecks come from an account in Cyber Flow Solution's name, but he is working for the Sexsearch Website. Dkt. #39, Exhibit 15. The logo for Orgasm.com's website is prominently posted on the wall of the Cyber Flow Solutions offices in California. Dkt. #39, Exhibit 13. DNR is registrant for Orgasm.com. Dkt. #39, Exhibit 11. Other information will be disseminated during the hearing which is now covered by a protective order that establish the interrelationship and degree of control of which certain parties have over various assets of the Sexsearch business.

## F. PLAINTIFF CAN ESTABLISH A PRIMA FACIE CASE ON ALL CLAIMS

### i. CONTRACT CLARITY

Defendants' dispute here is captured in this conclusory paragraph in this section of their brief.

> [1]The terms are clear. [2]All warranties are disclaimed. [3]Liability is limited to the amount Plaintiff spent on his membership. [4]TAC is only between members and Cytek (the website operator), then the claim is also meritless as to the other defendants who are not parties to the contract and therefore are not bound by its terms.

Dkt. #93 at 17.

Assuming arguendo the terms are clear, the Terms and Conditions (hereinafter referred to as "TAC") contain no warning that paid users may be contacted by or could be contacting children for sex. No one who reads the "TAC" understands that the Sexsearch Website service includes the opportunity to meet children for sex. Defendants' argument that the "TAC" are clear is not only specious, but if true, ghastly. They argue their business includes "clear" terms that members of its

service include children whom adult members may contact for sex.  Nonetheless, Defendants' pose, at best, an issue of fact for a jury, and it is extremely unlikely they succeed against the breach of contract claim nor any other claim by informing a jury of Ohio citizens that it is "clear" their site includes offering paid members access to children for sex.

### ii.  ALL WARRANTIES ARE NOT DISCLAIMED

It is true that in the "TAC" that the Sexsearch Website attempts to disclaim are all warranties. However, this is not the only warrant on the Sexsearch Website.  There is a warranty on its main page, that is, the page all members must first visit to logon and repeatedly return to every time they seek to use the service.  "All models are at least 18 years old, <u>all persons within this site are 18+</u>…." Dkt. #9, Exhibit 1.  Emphasis added.  In our free market system, warranties are matters which can make or break a consumer transaction.  This give with one hand and take with the other duplicity is explicitly prohibited by the Ohio Consumer Sales Practices Act.  Defendants' claim that this statement is merely a warning to minors to stay away from the Sexsearch Website.  This is an issue of fact for a jury to decide.  The argument is an insult to ones' intelligence.  The word "warning" does not appear in the statement.  It describes the age of "all persons within [the] site."  It is on the main page, the same page seducing viewers to join with promises of "real people, real sex" and "millions of members looking for sex" and "<u>adult</u> personals"  www.sexsearch.com redirected to www.sexsearchcom.com.  Emphasis added.  The site does not promise potential new members that all members are adults?  When Defendants clarify their site to include text like "real children, real sex" or "millions of members looking for children for sex" and "child on adult personals" their arguments regarding "clear terms" of their service contract and clear warranties will be strengthened considerably.  Their argument is that no one using their service misunderstands that their service really does provide real children for real sex and so forth.  This argument is as ludicrous as it is abhorrent.  Plaintiff has a substantial likelihood of

prevailing on his breach of contract claim.  In fact, if Defendants prevail, the only conclusion that can support their success on that claim is that they are running a criminal enterprise.

Should this Honorable Court accept the averments of Defendants,' such arguments would justify this Court immediately shutting down the operation of Defendants' Website service, at least in Ohio, to protect the children that Defendants' claim "everyone knows" are on its site available for adults for sex and readily accessing the "Internet's Best Hard Core Pornography."  The court has a legal duty to act within its authority to stop this appalling crime of arranging meetings between adults and children for sex.  Defendants' cannot win this argument and do not want to as they may face much more stringent consequences.

### iii.  DECEPTIVE TRADE PRACTICES IN LIMITING LIABILITY TO THE AMOUNT OF THE CONTRACT

"Defendants…have committed unfair, deceptive and unconscionable acts or practices in violation of R.C. 1345.02(A) and 1345.03 by incorporating in their consumer contracts a clause limiting damages for breach of implied warranties to the amount of the contract." Ohio, ex rel. Betty D. Montgomery Attorney General Plaintiff v. Thermal Seal, Inc. 2001 WL 1841771 (Sept. 18, 2001). Defendants' contract with Plaintiff limits liability for any breach solely to the cost of the service.  This provision is a deceptive trade practice for which there is no defense.  Id.

### iv.  THE REAL OWNER OF THE WEBSITE OF CYTEK LIMITED

The "TAC" Plaintiff agreed to did not mention Cytek Limited.  Dkt. #9, Exhibit 2.  Plaintiff was billed by Defendant, Experiencedinternet.com Inc.  Exhibit 2, to be filed under seal.  Defendants' offer legal argument, conjecture, speculation, and no substance to support their claim that Cytek, a so-called company, is the real owner.  Cytek owns no assets to run the business, does not control those assets, is not listed on any website as the owner of the business, not listed in any articles online as the owner of the business, does not have a board of directors, shareholders and does not meet or have any

discernable corporate structure or behavior. Defendants' have presented no contracts, leases, licensing

agreements or other evidence containing Cytek as a party to anything in its web like corporate

structure. Cytek is a figment of Defendants' imagination, a poltergeist designed to fool this Court into

believing in the imaginary. It is nothing more than characters on a page of their brief. Absolutely no

evidence as been submitted to establish such a corporate entity exists at all. This conclusion pertains to

DNR, Manic Media, Stallion.com FSC Limited, Fiesta Marketing International, Inc., Experienced

Internet.com, Inc. and all other corporate Defendants' subject to the current injunction. Further,

Sexsearch Website only recently amended their privacy policy page to include Cytek's name and

address. Prior to this modification another company was listed in its place. See Exhibit 3. Exhibit 3 is

a comparison of Defendants' Privacy Policy as of the date of the filing of Dkt. #9 and how they have

changed it since adopting the fraudulent scheme that Cytek is the real owner. Exhibit 3. The privacy

policy in Dkt. #9, provided to this court more than a month ago, has no mention of the company Cytek,

but instead has a company called "No Bounds Marketing" listed at the bottom of the privacy policy.

Once this litigation was known to Defendants, they joined forces, much as they have joined together in

multiple representation by single attorneys, and decided on the Cytek scheme. This defense was

successful in the California case in which they defrauded that federal court; it is reasonable they felt

they could work the scheme on this Court as well. The new privacy policy has been manipulated and

changed by Defendants. Exhibit 3. Defendants have already begun that which Plaintiff informed the

Court, manipulation of potential evidence to perpetuate a fraud upon the Court. Id. Unsworn

declarations of unknown persons not subject to cross examination, not declared to be adults claiming a

whole host of facts without any substantiation does not meet the bare minimum for evidence sufficient

to support any of Defendants' claims here

.

## v.  UNCONSCIONABILITY

Defendants' claim that Ohio's required notification in a contract of a three (3) day right of cancellation does not apply to the contract between Defendants and Plaintiff.  They are wrong.  This argument is dispatched by a plain reading of the Ohio Revised Code.

The contract at issue is defined under Ohio law as Prepaid Entertainment Contract.  R.C. 1345.41.

"(A) 'Prepaid entertainment contract' means a contract under which the buyer of a service pays for or becomes obligated to pay for service prior to the buyer's receipt of or enjoyment of any or all of the service and that is a contract for:…

(2) Social referral service, which includes any service that, for a fee, <u>provides matching of members of the opposite sex, by any means, for purposes of introduction, dating, or general social contacts</u>…." Id.  Emphasis added.

Plaintiff had the right to cancel his contract within three (3) days.  "(A) In addition to any right otherwise to revoke an offer or to terminate or cancel a sale or contract, the buyer has the right to cancel a prepaid entertainment contract until midnight of the third business day after the date on which the first service under the contract is available…."  R.C. 1345.43.

Defendants had duty to include Notice of Cancellation in their prepaid entertainment contract:

"(1) A completed form, in duplicate, captioned 'notice of cancellation,' shall be attached [any Prepaid Entertainment Contract] and be easily detachable and shall contain in ten-point bold-face type, the following statement:

"NOTICE OF CANCELLATION

(Enter date of contract)

(Date)

"You may cancel this contract for any reason at any time prior to midnight of the third business day after the date on which the first service under the contract is available, and if the facility or services that is the subject of the contract is not available when you sign the contract, you may cancel the contract at any time prior to midnight of the seventh business day after the date on which you receive your first service under the contract.  If you cancel within this period, the seller must send you a full refund of any money you have paid, except that a reasonable expense fee not to exceed ten dollars may be charged if you have received your first service under the contract.  The seller must also cancel and return to you within twenty business days any papers that you have signed.

"To cancel this contract you must deliver in person, manually, or by certified mail, return receipt requested, the signed and dated copy of this cancellation notice or any other written notice of cancellation, or send a telegram, to (name of seller), at (the address of any facility available for use by you) not later than midnight of the third business day after the date on which the first service under the contract is available, and if the facility or service that is the subject of the contract is not available when the contract was signed, not later than midnight of the seventh business day after the date on which the first service under the contract is available.

"I hereby cancel this contract.

_____ (date)

_____ (buyer's

signature)"  R.C. 1345.44.  The terms and conditions contract Defendants required Doe to agree to did not include the three day cancellation notice required under Ohio law.  Dkt. #9, Exhibit 2.

Failure of the seller using a prepaid entertainment contract to comply with cancellation requirements of 1345.01 et. seq. is de facto Violation of the Consumer Sales Practices Act:

"(A) Failure to comply with sections 1345.41 to 1345.50 of the Revised Code constitutes a deceptive act or practice in connection with a consumer transaction in violation of section 1345.02 of

the Revised Code." Defendants' contract, on its face, is a violation of the Consumer Sales Practices Act for which there is no defense. Plaintiff has a substantial likelihood of prevailing on this claim as Defendants have no defense to the de facto violations as the court was informed at the ex parte hearing.

Plaintiff cannot waive any provisions contained within these sections:

"Any waiver by the buyer of the provisions of sections 1345.41 to 1345.50 of the Revised Code is contrary to public policy and is void." R.C. 1345.49. Defendants' argument that Plaintiff waived any objection or claim arising from the absence of a right of cancellation provision is meritless.

### vi.  NO SPECIAL RELATIONSHIP NEEDED

Defendants again misrepresent the case law to the court regarding "special relationship." "As a matter of law, Plaintiff cannot establish the elements of a special relationship with any of the defendants, which is a necessary element of the negligent misrepresentation claim…." Dkt. #93 at 20. No case law recites the elements of negligent misrepresentation to require any special relationship.

The elements of negligent misrepresentation are as follows: "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." Manno v. St. Felicitas Elementary School, 161 Ohio App.3d 715, 2005-Ohio-3132, 831 N.E.2d 1071, at ∂ 33, quoting 3 Restatement of the Law 2d, Torts (1965) 126-127, Section 552(1), applied by the Supreme Court of Ohio in Gutter v. Dow Jones, Inc. (1986), 22 Ohio St.3d 286, 22 OBR 457, 490 N.E.2d 898, and Haddon View Invest. Co. v. Coopers & Lybrand (1982), 70 Ohio St.2d 154, 24 O.O.3d 268, 436 N.E.2d 212.  See, also, Martin v. Ohio State Univ. Found. (2000), 139 Ohio App.3d 89, 104, 742 N.E.2d 1198.  The above citations, including the Ohio Supreme Court citation suffice to expose

Defendants misrepresentation that an element of this cause of action includes alleging the existence of a "special relationship."  It does not.

"A representation made with an honest belief in its truth may still be negligent, because of lack of reasonable care in ascertaining the facts, or in the manner of expression, or absence of the skill and competence required by a particular business or profession."  Martin, 139 Ohio App.3d at 103-104, 742 N.E.2d 1198.  Whether an actor used reasonable care in acquiring or communicating information is a question for the jury, "unless the facts are so clear as to permit only one conclusion."  Marasco, 2004-Ohio-6715, 2004 WL 2895973, at ¶ 53, citing 4 Restatement of the Law 2d, Torts (1977), Section 552, Comment e;  see, also, Gentile v. Ristas, 160 Ohio App.3d 765, 2005-Ohio-2197, 828 N.E.2d 1021, at ¶ 78.

"No reasonable person who uses the internet could justifiably rely in any express warranties."  Dkt. #93 at 21.  This is not a defense; it is an admission of fraud.  Defendants are attempting to evade liability by arguing their express warranties should not have been believed.  Moreover, Plaintiff was somehow wrong to have believed Defendants' express warranties.  If this were a viable defense, all deceptive business like Defendants' would make the same express warranties and simply argue a defrauded consumer was stupid to have relied upon them.

### vii.  BREACH OF WARRANTY CLAIMS ARE MERITORIOUS

Sexsearch Website offers a services and as such, Ohio's Uniform Commercial Code does not apply in its entirety, and that includes the warranty provisions found in Ohio Revised Code Section 1302.26.  Contracts for services are governed by Ohio's Common Law. See, Loyd v. Ewald, 1988 Ohio App. LEXIS 1235 (1988).  Plaintiff's breach warranty claims do not fail for the reasons set forth in the Memorandum of Defendants.  Counsel for Defendants' cites Ohio Revised Code Section 1302.26 entitled "Express warranties by affirmation, promise, description, sample," clearly, a provision within

the Ohio's Uniform Commercial Code codified from Article 2.  Defendants' assert that (1) under Ohio Law there are no express warranties for service contracts; and (2) Plaintiff was unreasonable in his reliance on the warranties found within the Sexsearch Website.

First, Defendants' fail to recognize that Ohio does in fact provide for express warranties under the Common Law contrary to Defendants' assertions.  "The elements required for a common law express warranty claims are similar to some extent to those for a fraud claim." City of Cleveland v. North Pacific Group, Inc., 2002 Ohio 3117 citing Rogers v. Toni Home Permanent Co., 167 Ohio St. 244 (1958) (an express warranty may be defined as an affirmation of fact by the seller of a product or commodity to induce the purchase thereof and upon which affirmation the buyer relies in making the purchase.)  Further, Defendants' completely fail to address the issue of implied warranties under Ohio Law in any context.

Second, Plaintiff was reasonable in his reliance upon this affirmation of fact by Sexsearch Website that "all persons within this site are 18+."  Additionally, Sexsearch Website was selling the commodity "Real People, Real Sex."  Defendants' would have this Honorable Court believe that Plaintiff was aware that there were children on this website, and he purchased his membership based on said affirmation anyway exposing himself to criminal liability.  It is inconceivable that Plaintiff thought he was on an adult online dating website which warranted "all persons within this site are 18+," and that he contemplated children had access to this website.  Especially, given that the privacy policy page, "expressly and strictly limits membership to adults."  It defies logic.

### viii.  "OCSPA" APPLIES TO THE CASE AT BAR

The "CDA" does not preempt state law in this arena as previously articulated in earlier portions of this brief.  Again, Plaintiff is not seeking recompense for information published by any information content provider; he is seeking remuneration for a variety of causes of actions unrelated to Jane Roe actual profile.  The status of Defendants' is in dispute.  Plaintiff asserts that Defendants are

24

"information content providers" under the "CDA" because they control content and have the power to modify content. Dkt. #39, Exhibit 84 at p. 233. Defendants' assert that they bask in the immunity of the "CDA" under a designation of "Interactive Computer Service Provider." This is an overstatement. As previously articulated, Plaintiff's expect in the near future to amend the Complaint to include additional causes of action for the creation of fraudulent profile which were sent to our client. Anthony would not immunized Sexsearch as an "Interactive Computer Service Provider" when they are, in fact, the creators of fraudulent conduct.

The "OCSPA" applies to the Sexsearch Website contrary to their claims. The Sexsearch Website refers in its own contract no less than eight times to itself as a "Service." Dkt. #39, Exhibit 2. You cannot on one hand represent yourself as a service provider, and then, in the same breath claim you do not qualify as a service. It is counterintuitive. Clearly, Sexsearch Website is not claiming it is offering goods. There is absolutely no reference in the "TAC's" to the Sexsearch Website as a good. Ohio Administrative Code Section (C)(2) defines a service as "performance of labor for the benefit of another." The term labor is not defined in the administrative code with relation to the "OCSPA." Defendants' would have this Court find that labor implies only physical exertion. This would be inconsistent with both the "OCSPA" and common sense. Labor is defined as "productive activity for the sake of economic gain; physical or mental work; to exert ones powers of body or mind." http://www.dictionary.com.

It is irrational to believe that there is no physical exertion occurring in the electronic transmission of services irrespective of that notion mental exertion can be as laborious or more laborious than physical exertion. Under Defendants' definitional limitations artists, actors, writers, and lawyers would not qualify as service providers, but a provider of goods? That makes no sense. Website operations like Sexsearch Website clearly have at least some minimal physical exertion with the addition of mental exertion. Sexsearch Website cannot claim it does not provide either a good or a

service when on its "TAC" it represents it is referred to as a service to everyone whom it engages in contract.

Furthermore, these rules of construction are to be liberally construed so as to promote the rules purpose and policies:

> (2) The purposes and policies of these rules are to:
>
> (a) Define with reasonable specificity acts and practices which violate section 1345.02 or 1345.03. or 1345.031 of the Revised Code;
>
> (b) Protect consumers from suppliers who engage in referral selling, commit deceptive acts or practices, or commit unconscionable acts or practices;
>
> (c) Encourage the development of fair consumer sales practices.

Ohio Admin. Code 109:4-3-01(A)(2)(a)-(c).  To so restrict the definition of labor would undoubtedly be rigid construction of the rules which require liberal construction pursuant to the Administrative Codes mandate.  Ohio Admin. Code 109:4-3-01(A)(1).  For the proposition that website operations should not be held accountable under "OCSPA," Defendants cite <u>Hoang v. Etrade</u>, 151 Ohio App. 3d 363 (2003).  <u>Hoang</u> is a single eighth district case with dicta which is unsupported by the rule construction itself.  It seems to be an aberration.  There are few cases which follow its holding with relationship to certification of class actions, but none with respect to the issue at bar.

It is true that there are exceptions for publishers under Ohio Revised Code Section 1345.12(B). However, with respect to the litigation against Defendants the statutory definition is inapplicable. Again, Defendants' assert they are publishers to no avail forgetting this suit doesn't involve the content of the pages created in part by a child, but rather, the content of the "TAC's" created, solely, by the Sexsearch Website.

### ix.  DEFENDANTS' CAN BE HELD LIABLE FOR NEGLIGEN INFLICTION OF EMOTIONAL DISTRESS

For the reasons contained herein, the "CDA" does not preempt a state law claims for negligent infliction of emotional distress.  Defendants' allege their conduct did not create a risk of harm to Plaintiff.  Plaintiff became a paying member reliant upon Defendants' promises that he would meet adults for sex.  Instead, Defendants' conduct, knowing that children were accessing and becoming members of their website as they repeatedly admit in their opposition to the continuation of the Temporary Restraining Order, is what created the harm Plaintiff now suffers.  His conduct with regard to Jane Roe was the conduct that Defendants' solicited his payment for.  He paid them for access to other adults seeking sex.  "Real people, real sex."  Defendants were aware children were members of their site, and they chose not to do anything to prevent them from becoming members or warn members like Plaintiff that children were members.

Facing prison time for using Defendants' service the way it was intended to be used is certainly sufficient to cause severe and debilitating emotional distress.  The harm here was not caused by Plaintiff's acts.  He reasonably relied, as one does when entering a bar, that those in charge of the facility have completed their duties faithfully and insured that only people of age are able to access the service provided.  Once a member of Defendants' service, Plaintiff had no further responsibility to screen members for their ages.  Defendants' have provided no support for such a duty on behalf of Plaintiff.  Defendants' had at the time Plaintiff was a member of their service and continue to have that duty.  Plaintiff paid for their performance.  Defendants' promised that they were performing that duty and warranted that all persons in the site were adults.  If it was Plaintiff's responsibility to screen members for age, what was he paying for?  Apparently he was paying for the right to meet people of unknown age, including children, seeking sex?  That disclosure is conspicuously absent from Defendants' contract, website, seductive come-ons promising "millions of members looking for sex,"

etc.  Defendants' argument, if accepted by this Honorable Court, is itself an admission of a fraud –
Plaintiff apparently was paying them for nothing and so were millions of users of their service.  They
were not even guaranteeing that he could avoid committing a crime by using their service.

x.  **DEFENDANTS' FAILED TO WARN PLAINTIFF THAT IT PERMITTED CHILDREN TO SEEK ADULTS FOR SEX VIA ITS WEBSITE**

"Plaintiff was warned many times about the risk of minors on the site…."  Dkt. #93 at 26.  The
answer to this claim is a question, where?  Nowhere in the "TAC", warranties, come-on ads, etc. are
any potential members warned, "hey you may be having sex with kids, or kids may be contacting you
for sex."  This claim is false.

"Plaintiff chose to ignore those warnings."  Id.  Defendants' myopia on this argument is equally
stunning.  In making this statement, it is telling the alleged ten (10) million members that they have
been warned, somehow, and by continuing their membership they are choosing to ignore a warning
located (somewhere on the site) that they are paying for a service that includes Defendants' delivering
children to adults for sex.  They are paying for a service that amounts to a criminal enterprise.
Defendants' cannot lawfully, intentionally, deliver children to adults for sex and vice versa.
Defendants' cannot lawfully, recklessly, deliver children to adults for sex and vice versa.  They freely
admit they know that is happening or likely to happen on their site.  Among their purported ten (10)
million members, Jane Roe is one (1) minor.  Does the court really think she is the equivalent of the
Super Lotto Winner in that regard?  She is not the only one (1) in a professed membership base of ten
(10) million members that is a child.  Defendants' numbers are too high to ignore that there are not
more children on the Sexsearch Website – as we debate these issues in court.  Defendants' are
admitting there are more minors.  They do not care.  They see money, not children having sex with
adults and the devastation that can cause for both the unwitting adult member and the vulnerable child.
In fact, Defendants' likely see only money coming from those adults and those children having sex

with each other facilitated by Defendants' service. They make money either way. If this court accepts that Defendants' did warn Plaintiff about the fact that they were delivering children to adults for sex, this Honorable Court must use its authority to shut the entire site down to protect those children that Defendants' cannot seem to from utilizing their service. Any other ruling is the equivalent to saying that, on the Internet, a certain number of children and adults just have to be permitted to have sex using Defendants' service in order for Defendants to make their millions. In that case, the law has lost all control of the Internet.

### xi.   DEFENDANTS' FAILED TO WARN PLAINTIFF

"(1) that there was a duty to warn…." Id. Defendants know and openly admit they knew that children were on their site as members seeking or being sought by adults for sex. Dkt.#93 at 2-3. Therefore, there is a duty to warn members that the pretense of "adult personals" is not accurate, and that, one may be engaging in sex with children. The Sexsearch Website does not warn members of any possibility that such a scenario exists. Review the "TAC", the warranties, and the ad copy. Nowhere do Defendants' warn members of the criminal enterprise they are paying to participate in.

"(2) that duty was breached…." Dkt. #93 at 26. The duty was breached because no reasonable person in Plaintiff's shoes would have engaged in sexual activity with a minor if Defendants did warn them. They have cited to no place on their Website or in the "TAC" in which such a warning exists.

"(3) that the injury proximately resulted from that breach." Id. Plaintiff has already suffered irreparable injury in the form of damage to his emotional state, financial interest, and reputation in the community. His own children were injured and continue to be so as he is labeled a criminal for merely using Defendants' service as intended. As a side note, nowhere on Defendants' Website service or "TAC's" do they warn members to check the ages of other members they meet for sex. Instead, they encourage sex parties, live video chat, asking questions of sexpert (and Defendant owner) Jenna Jameson.

29

"In this case…the danger open and obvious."  Id.  Defendants were at the time this Cause of Action arose and are running a criminal enterprise.  If it is believed by this Court that Plaintiff was warned that children were members of this Website service, and he ignored that warning, Defendants' are presently delivering children to adults for sex, and they are delivering children to "the Internet's best hard core pornography" in exchange for monetary compensation.  In that case, the entire contract with Plaintiff is for the purpose of committing criminal acts on both sides of the contract, if the Defendants' failure to warn argument is accepted by the court.  Such a contract is, of course, void ab initio.

Finally, Defendants' own words betray the failure of their argument here.  SexSearch is called an adult sex website.  It is not called, but perhaps Defendants' are hinting that accuracy compels that it be called, an adult-child sex website.  "Real people, Real sex" should be rewritten, "Real kids, Real sex."  This is, after all, consistent with many domains the Defendants own and control such as Freeteenslits, Devirginized.com (with meta key words like "broken hymens bloody bald snatch sweet pink young girls naked innocent next door teen schoolgirls girlfriends bimbos panties video sex sexy oral facial cream fisting spanking boys girl girls nude fuck fucking ass hymen film avi mpeg chat pornography free."  Dkt. #9, Exhibit 18 at 2.

## CONCLUSION

Wherefore, Plaintiff requests this Honorable Court grant his motion for a preliminary injunction for the aforementioned bases.

/s/Dean Boland
Dean Boland, 0065693
18123 Sloane Avenue
Lakewood, Ohio 44107
dean@deanboland.com
216.529.9371 phone
216.803.2131 fax
Attorney for John Doe

/s/Brandie L. Hawkins
Brandie L. Hawkins, 0078485
124 S. Metcalf Street
Lima Ohio 45801
419.225.5706 ph
419.225.6003 fax
Attorney for John Doe

### CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Response to Defendants' Brief in Opposition to

Plaintiff's Motion for a Preliminary Injunction filed this 14th Day of April, 2007.  Notice of this filing

will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this

filing through the Court's system.


/s/ Dean Boland
Dean Boland